1

2

3

4

5

6

7

8

9

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10 EDDIE CARRILLO,                    ) 1:09-cv—01331-AWI-BAM-HC
                                      )
11             Petitioner,            ) ORDER SUBSTITUTING WARDEN MARTIN
                                      ) BITER AS RESPONDENT
12                                    )
      v.                              ) FINDINGS AND RECOMMENDATIONS THAT
13                                    ) PETITIONER'S STATE LAW CLAIMS
   MARTIN BITER, Warden of Kern       ) CONCERNING ALTERNATE JURORS AND
14 Valley State Prison,               ) SENTENCING ERROR BE DISMISSED
                                      )
15             Respondent.            ) FINDINGS AND RECOMMENDATIONS THAT
                                      ) THE PETITION FOR WRIT OF HABEAS
16 _____    ) CORPUS BE DENIED AND JUDGMENT BE
                                        ENTERED FOR RESPONDENT
17
                                        FINDINGS AND RECOMMENDATIONS TO
18                                      DECLINE TO ISSUE A CERTIFICATE OF
                                        APPEALABILITY
19

20        Petitioner is a state prisoner proceeding pro se and in

21 forma pauperis with a petition for writ of habeas corpus pursuant

22 to 28 U.S.C. § 2254.  The matter has been referred to the

23 Magistrate Judge pursuant to 28 U.S.C.§ 636(b)(1) and Local Rules

24 302 and 304.  Pending before the Court is the petition, which was

25 filed on July 24, 2009, and amended to name a proper Respondent

26 on August 17, 2010.  Respondent filed an answer to the petition

27 on December 22, 2010, and lodged portions of the state record in

28 support of the answer.  Petitioner did not file a traverse.

1

I.   <u>Substitution of Martin Biter as Respondent</u>

Respondent answered on behalf of Respondent James A Yates, Warden of Pleasant Valley State Prison, where Petitioner was incarcerated at the time the petition and answer were filed. Petitioner subsequently filed a notice of change of address on September 29, 2011, reflecting that Petitioner's present custodial institution is the Kern Valley State Prison (KVSP).

Title 28 U.S.C. § 2242 provides that a petition for writ of habeas corpus shall allege the name of the person who has custody over the applicant.  Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules) provides that if the petitioner is currently in custody under a state court judgment, the petition must name as respondent the state officer who has custody.  A failure to name the proper respondent destroys personal jurisdiction.  <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).  The warden of the penitentiary where a prisoner is confined constitutes the custodian who must be named in the petition, and the petition must be filed in the district of confinement.  <u>Johnson v. Reilly</u>, 349 F.3d 1149, 1153 (9th Cir. 2003).

Fed. R. Civ. P. 25(d) provides that when a public officer who is a party to a civil action in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. It further provides that the Court may order substitution at any time, but the absence of such an order does not affect the substitution.

The warden at KVSP is Martin Biter.

1    Accordingly, it IS ORDERED that pursuant to Rule 25(d),
2 Warden Martin Biter is SUBSTITUTED as Respondent.

3    II.  <u>Jurisdiction</u>

4    Because the petition was filed after April 24, 1996, the
5 effective date of the Antiterrorism and Effective Death Penalty
6 Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  <u>Lindh</u>
7 <u>v. Murphy</u>, 521 U.S. 320, 327 (1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1008
8 (1997); <u>Furman v. Wood</u>, 190 F.3d 1002, 1004 (9th Cir. 1999).

9    A district court may entertain a petition for a writ of
10 habeas corpus by a person in custody pursuant to the judgment of
11 a state court only on the ground that the custody is in violation
12 of the Constitution, laws, or treaties of the United States.  28
13 U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362,
14 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, –, 131 S.Ct. 13,
15 16 (2010) (per curiam).

16    Petitioner, an inmate of the KVSP at Delano, California,
17 claims that he suffered violations of his rights under the
18 Constitution in the trial and sentencing proceedings that
19 resulted in the judgment challenged in the petition.  Thus,
20 violations of the Constitution are alleged.

21    Further, Petitioner was convicted and sentenced in the
22 Superior Court of the State of California, County of Madera,
23 which is located within the jurisdiction of this Court.  28
24 U.S.C. §§ 2254(a), 2241(a), (d).

25    As previously noted, Petitioner has named as a respondent a
26 person who had custody of the Petitioner within the meaning of 28
27 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254
28 Cases in the District Courts (Habeas Rules).  <u>See</u>, <u>Stanley v.</u>

1   California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).

2       Accordingly, the Court concludes that it has jurisdiction

3   over the proceeding and over the Respondent.

4       III.   Procedural Summary

5       On November 14, 2006, a jury found Petitioner guilty of

6   attempted murder in violation of Cal. Pen. Code §§ 664, 187, and

7   the jury further found that Petitioner had personally used a

8   firearm and had personally and intentionally discharged a firearm

9   and caused great bodily injury in the commission of the offense

10  within the meaning of Cal. Pen. Code §§ 12022.53(b)-(d) and

11  12022.7(a).  The jury also found Petitioner guilty of assault

12  with a firearm in violation of Cal. Pen. Code § 245(a)(2) and

13  found that he had personally used a firearm and had personally

14  inflicted great bodily injury in the commission of the crime in

15  violation of Cal. Pen. Code §§ 12022.5(a) and 12022.7(a).  The

16  findings concerning the enhancements caused the substantive

17  offenses to become serious felonies within the meaning of Cal.

18  Pen. Code § 1192.7(c)(8).  In a bifurcated proceeding, the jury

19  found that Petitioner had suffered a prior serious felony

20  conviction within the meaning of Cal. Penal Code §§ 667(b)-(i)

21  and 667.5(b). (LD[1] 1 [Clerk's Transcript on Appeal, Volume One],

22  143-144, 177-186.)

23      On February 13, 2007, the court sentenced Petitioner to life

24  in prison with the possibility of parole for the attempted murder

25  plus a consecutive term of twenty-five (25) years to life for the

26  firearm enhancement pursuant to Cal. Penal Code § 12022.53(d)).

27  _____

28      [1] "LD" refers to documents lodged by Respondent in connection with the
    answer.

4

(LD 1, 227.)  The other count and enhancements were stayed pursuant to Cal. Pen. Code § 654.  (Id.)

On February 21, 2007, Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District (DCA), in case number F052304. (LD 1, 232, 240.)  After briefing by the parties (LD 2 [Petitioner's op. brief], LD 3 [People's resp. brief], LD 4 [Petitioner's reply brief]), the DCA affirmed Petitioner's conviction and sentence in an unpublished, reasoned decision filed on February 26, 2008.  (LD 5.)

On March 28, 2008, Petitioner filed a petition for review with the California Supreme Court in case number S162175. (LD 6.) Review was summarily denied on June 11, 2008.  (LD 7.)

On July 21, 2009, Petitioner filed a petition for writ of habeas corpus with this Court.  (Doc. 1.)[2]

IV.  Factual Summary

When more than one state court has adjudicated a claim, this Court will analyze the last reasoned decision.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).  Even where procedural default is not an issue, the decision in which the state court last explained its reasons for the decision must be identified in

---

[2] The date on which Petitioner's pro se petition was filed is computed by application of the mailbox rule.  Under the mailbox rule, a prisoner's pro se habeas petition is "deemed filed when he hands it over to prison authorities for mailing to the relevant court."  Huizar v. Carey, 273 F.3d 1220, 1222 (9th Cir. 2001); Houston v. Lack, 487 U.S. 266, 276 (1988).  The mailbox rule applies to federal and state petitions alike.  Campbell v. Henry, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (citing Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th. Cir. 2003), and Smith v. Ratelle, 323 F.3d 813, 816 n.2 (9th Cir. 2003)).  It has been held that the date the petition is signed may be inferred to be the earliest possible date an inmate could submit his petition to prison authorities for filing under the mailbox rule.  Jenkins v. Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003), overruled on other grounds, Pace v. DiGuglielmo, 544 U.S. 408 (2005).

order to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1). <u>Barker v. Fleming</u>, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); Bailey <u>v. Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir. 2003). Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). Thus, where the California Supreme Court denies a habeas petition or petition for review without citation or comment, a district court will "look through" the unexplained decision of that state court to the last reasoned decision of a lower court as the relevant state-court determination. <u>Ylst v. Nunnemaker</u>, 501 U.S. at 803-04; <u>Taylor v. Maddox</u>, 366 F.3d 992, 998 n.5 (9th Cir. 2004). A petitioner has the burden to overcome or rebut the presumption by strong evidence that the presumption, as applied, is wrong. <u>Ylst</u>, 501 U.S. at 804.

Here, the last reasoned decision was the decision of the DCA on direct appeal.

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness. 28 U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004). The following factual summary is taken from the opinion of the DCA in Case number F052304, filed on February 26, 2008. (LD 5, 2-9.) <u>See</u>, <u>Galvan v. Alaska Dep't. Of Corrections</u>, 397 F.3d 1198, 1199 n. 1 (9th Cir. 2005) (setting forth a factual

summary from the state appellate court's decision).

On June 19, 2006, Carlos Urbano, was residing with his aunt in Madera. Around 9:00 or 9:30 p.m., Urbano was sitting in a little shack behind the house, fixing a weed eater. The room was well lit.

As Urbano was working on the weed eater, defendant walked into the shack. It appeared defendant was handing him a soda bottle. But as Urbano looked up, he saw defendant raise up the plastic bottle, felt a blast, and realized he had been shot. Urbano felt a twitch below his right eye. He was then shot again on the right side of the face. He got up ran out of the room. He had to rush around defendant to get to the door. Defendant then shot him a third time in the chest. As Urbano was running through the door, he was shot again in the back. Urbano remembered falling in the driveway, and waking up a few minutes later and making it into the carport, between the storage shed and the house.

After regaining consciousness in the carport, Urbano walked inside the house. He went through the kitchen and then fell down in the dining area. His young cousins, who had been watching television, discovered him. At this time, Urbano felt a burning sensation in his face. His little cousin started screaming, and his aunt, who had been outside talking on the phone, came in. She asked him what happened. Urbano told her "Eddie shot me."

Urbano remembered waking up in the hospital. He was there about a week and had surgery on his face. He had another surgery about a month later, where a plate was placed beneath his right eye because it was dropping. As a result of his injury, his right eye was currently bigger than his left eye. He also described having sleep problems, cold sweats, pain in his jaw, pain in his eye, and "heart pains." In addition, Urbano experienced stuttering and memory problems.

Urbano testified he had known defendant all his life and had never had any problems with him before the day of the shooting. Defendant did not say anything when he shot Urbano. Urbano was very surprised that his cousin shot him.

Urbano admitted he consumed methamphetamine and marijuana the day before the shooting but stated he was not under the influence when he was shot and was able to recognize who shot him.

Urbano saw defendant earlier that day around lunchtime. Urbano testified that, besides defendant, there was one

other Eddie Carrillo in his family, his dad's sister's son, who was about 50 years old and lives in Sacramento. This Eddie was not present the day of the shooting and Urbano had not seen him for many years. Defendant's son is also named Eddie but he is only a child. Urbano could not recall whether defendant's son was present the day of the shooting but confirmed he would be able to tell them apart. Urbano had no doubt defendant was the one who shot him.

When Urbano was in the shack working on the weed eater, he was not alone. Sammy, a friend of Urbano's cousin, Andrew Rodriguez, was sitting on the couch about four to five feet from Urbano. Urbano confirmed that defendant, not Sammy, shot him. Sammy and defendant do not look alike. Urbano did not know Sammy very well and he was unaware of his current whereabouts. There was also somebody sitting by Sammy. Urbano did not know him or his name. He was about 19 years old, medium height, and thinner than defendant. He had come there with Sammy.

Urbano testified that he had once been a "northerner" or member of the Norteno gang, but he no longer participated in the gang. Urbano testified he had prior criminal convictions, including a misdemeanor petty theft in 1994 and felony petty theft with a prior in 2000. He was incarcerated at Corcoran for about two years. He was not a member of a gang prior to entering prison but joined the gang after he went into prison. He quit the gang while he was still in prison because he was "[t]ired of the whole system."

Urbano testified it did not feel safe to say anything about the gang and that he was "very uncomfortable" with the prosecutor's questions. When he quit the gang, he requested to be housed with other dropouts. It would be quite dangerous to stay housed with Nortenos after dropping out of the gang. When he talked to the prison authorities, he was "PCed up" which means he got "[p]rotected custody."

Urbano had a fight with a Norteno about a week before the shooting. When asked what the fight was about, he testified: "I don't know. Probably we just fucked up drinking. Excuse my language. Yeah, probably we were drinking." Urbano did not think the fight was so serious that it would result in somebody coming to shoot him. The only person he told about the fight was his cousin, Andrew Rodriguez.

Madera Police Officer George Yang responded to the shooting. He entered the house with Officer Louis Reyes and observed Urbano lying in the kitchen. Urbano had been shot and his face was covered with a towel.

8

Officer Reyes asked him what happened. Urbano said he had been shot by his cousin, Eddie Carrillo. Urbano advised the officers he had been shot in the backyard. Urbano did not appear to Officer Yang to be under the influence of drugs because of his ability to answer the officers' questions about what happened.

Urbano's aunt, Elizabeth Rodriguez, testified she was at the house on June 19, 2006. At 9:30 p.m., Rodriguez was in her front yard, watering the grass and talking to her sister on the phone. Her grandchild called her inside the house, saying there was something wrong with Urbano. Rodriguez went inside the living room, walked into the dining room, and found Urbano lying on the floor. Urbano had blood on his face and was moaning. He told Rodriguez that "Eddie" shot him. She had seen defendant at her house earlier in the backyard. She was unaware of any problems between defendant and Urbano. As far as she knew, they got along.

Officer Louis Reyes testified that when he was dispatched to the residence, he observed Urbano lying on his back in the dining room area. A blood-stained towel covered his face. There was blood on his clothing and on the floor beneath him. He appeared to be injured and in pain. Officer Reyes asked him what happened, and Urbano said, "he shot me." When the officer asked who shot him, Urbano responded, "Eddie Carrillo." Officer Reyes asked him who Eddie Carrillo was. Urbano answered, "my cousin." Officer Reyes asked Urbano how many times he was shot. Urbano lifted up his left arm and showed him either four or five fingers, and then put his arm down. Officer Reyes asked Urbano why defendant shot him, and said he did not know. When the officer asked again, Urbano started to complain about pain. Urbano did not act like somebody under the influence of drugs but was very coherent.

Dr. John Bilello, MD, the attending trauma surgeon at University Medical Center in Fresno, treated Urbano after the shooting. Dr. Bilello testified that Urbano had gunshot wounds to the face and upper torso, a gunshot wound under the right eye, and one in the upper right chest. Before Urbano saw Dr. Bilello, he was likely given an opiate called Fentanyl for his pain. No bullets were recovered from Urbano's body, but a CT scan showed bullet fragments in his neck, near the second cervical vertebra at the top of the neck. Dr. Bilello thought the floor of Urbano's right eye socket had been damaged and had to be repaired at a later date.

Madera Police Detective Chuck Smith testified that he had experience with a plastic bottle being used as a silencer during his special training. His instructor

9

demonstrated how certain objects, including "PVC pipe, two-liter and one-liter plastic bottles, common soda bottles [could be used] to fit the end of a variety of pistols, nine millimeter all the way down to .22 caliber." Detective Smith actually shot a handgun using a plastic bottle. The result was a noticeable reduction in the report of the shot. Based on his experience and training, he opined that a plastic bottle can be an effective silencer.

Elizabeth Rodriguez's son, Andrew Rodriguez, testified that on the night of the shooting, he had just come back from a girl's house and was going to borrow his cousin's truck and return to the girl's house, when he heard his mother screaming. Andrew ran around the house and entered through the backdoor. He saw Urbano on the floor with blood all over him. Andrew grabbed a towel and put it on Urbano's face and then called 911. Andrew asked Urbano what happened. Andrew just remembered Urbano saying, "[h]e shot me, he shot me." Andrew could not remember what he told Officer Reyes except this and that he put a towel over Urbano's face.

Officer Reyes was recalled as a witness. According to Officer Reyes's testimony, when he spoke to Andrew the night of the shooting, Andrew said that when he asked Urbano what happened, Urbano responded: "Eddie shot me." Officer Reyes testified when he was questioning witnesses that night, he always referred to "Eddie Carrillo" to make sure they knew he was talking about defendant. He never just said "Eddie." No one ever corrected him or said he had the wrong person.

Madera Police Officer Michael Kutz testified that on the night of the shooting, defendant turned himself in to the sheriff's department. Officer Kutz went to the sheriff's department and custody of defendant was turned over to him. Officer Kutz handcuffed defendant, put him in the back of his patrol car, and transported him to the jail. The officer advised defendant he was being arrested for attempted murder. While they were in the process of booking defendant, defendant asked Officer Kutz, "Did you guys make a big deal of this?" Officer Kutz described defendant's demeanor as "very nonchalant" and "kind of arrogant."

Herminio Sauceda of the Madera County Department of Corrections was the prosecution's gang expert. Sergeant Sauceda testified that for the past 10 years, he has been involved in the classification of inmates to be housed in their facility. Sergeant Saucedo testified to his familiarity with the Norteno and Sureno criminal street gangs, whose members must be separated from one another for their safety. Dropouts or nonaffiliated gang members are also separated from active ones.

10

Sergeant Sauceda opined that defendant was a member of the Norteno gang. The bases of his opinion are discussed in greater detail below. Sergeant Sauceda further opined that Urbano was a Norteno gang member until 2002. Urbano's current status was that of a dropout. Sergeant Urbano (sic)[3] testified he was aware that a "bad news list" was found at Corcoran State Prison. Twenty to 30 people from Madera County were on the list. Each was identified by their California Department of Corrections number (CDC number) and moniker, which is the street name they are given when they are "jumped in" to the gang. Urbano's moniker is "Shotgun" and is tattooed to the back of his neck. Urbano was listed on the hit list by his moniker, his CDC number, and the town of Madera.

Urbano (sic) explained that the Nortenos are highly organized within the jail system. When they first enter, they are contacted by the "shot-caller" and required to memorize, within 60 to 90 days, a two-page code of conduct called "14 bonds." When they get out of prison and a Norteno asks them to recite the bonds, they should be able to repeat them quickly. Members in and out of the prison system communicate via "micro writing" on small pieces of rolled up paper. A "bad news list" is a list that usually comes from the state prison, where an individual's name appears because he broke one of the codes, such as ratting on a fellow Norteno, having an affair with another Norteno's spouse, or committing a crime against another Norteno family.

Frequently, the bad news list includes individuals who no longer want to be affiliated with a gang or were given an assignment to assault someone and refused. At that point, they will go on the list, which goes up to the ranking Norteno in the facility. He puts the information on micro writing and it goes from that prison to another prison, or to people out on the street. The bad news list is essentially a "hit list" but the gang members do not refer to it as such. Instead, they call it "the green light." "They say, man, there is a green light on me, which means it's a go for anybody who sees this individual on the streets, then they have a green light to assault him." Sergeant Sauceda confirmed the list is the equivalent of being an order to attack any person whose name appears on the

---

[3] The DCA's opinion refers to "Sergeant Urbano" instead of Sergeant Sauceda at the point referenced, and in the next paragraph it refers to "Urbano" as the person explaining the customs of the Nortenos. However, a review of the pertinent portion of the reporter's transcript reflects that it was Sergeant Sauceda, the prosecution's gang expert, who gave all the pertinent testimony. (LD 13, 1599-1667; LD 14, 1813-43.) "Urbano" was the name of the victim of Petitioner's offenses.

list. A dropout will be placed on a bad news list, "[b]ecause he just disrespected the Nortenos by refusing to be affiliated any longer. It's a blood in, blood out."

When asked if it would benefit a gang to take a hit on a dropout, Sergeant Sauceda testified: "It would benefit a gang because if you take a dropout out, it's only setting the example for those that are current, those that are associated at this time. They know already that if they drop out the same thing is going to happen to them. It's kind of an intimidation, a threat factor."

Sergeant Sauceda explained the process of dropping out of a gang in prison. The dropout must go to the classification unit, and undergo a "debriefing," where they sit down with one of the officers and basically go through their whole criminal history, from when they first started with the gang. Thus, the dropout has to essentially identify crimes he has committed, known gang members and their rank structures, any kind of codes he knows of, and any kind of hits that may be coming. He is then placed in protective custody for his own safety.

Sergeant Sauceda testified that a gang member could elevate his standing in the gang by attacking a family member who was on the dropout list or hit list. "It just shows the loyalty to the gang. The way they see it is if you are willing to commit a crime or a violent crime against their own family member there is nothing else you wouldn't do for that gang."

Sergeant Sauceda opined that, assuming an active gang member attempted to murder a dropout of the same gang or somebody on a hit list of the gang, using a firearm, it would benefit the gang: "[T]he gang uses that as an intimidation for the ones that are presently with a gang so that they don't have any thoughts about moving out of the gang because if they do then the same thing is going to happen to them." The status of the person who attempted the hit would also be bolstered. It would have the other members thinking of him as a leader and as one who is loyal to the gang.

Petitioner did not testify, and the defense did not present any affirmative evidence.  (LD 14, 1841-44.)

V.  <u>Standard and Scope of Review</u>

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on

behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000). It is thus the governing legal principle or principles set forth by the Supreme Court at the pertinent time. Lockyer v. Andrade, 538 U.S. 71-72.

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002). A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or

13

fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. <u>Hernandez v. Small</u>, 282 F.3d 1132, 1142 (9th Cir. 2002); <u>see</u>, <u>Williams</u>, 529 U.S. at 407. An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. <u>Williams</u>, 529 U.S. at 410.

A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. <u>Harrington v. Richter</u>, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. <u>Id.</u> In order to obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87. The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state-court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. <u>Cullen v. Pinholster</u>, 131 S. Ct. at 1398.

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 131 S. Ct. at 1398. Evidence introduced in federal court has no bearing on review

1    pursuant to § 2254(d)(1).  Id. at 1400.

2         VI.  Discharge of Juror Number Four

3         Petitioner argues that the trial court violated his Fifth,

4    Sixth, and Fourteenth Amendment rights to a trial by a fair and

5    impartial jury and a unanimous verdict when the court discharged

6    juror number four during deliberations.  Petitioner contends that

7    juror number four was discharged without good cause and because

8    of the juror's view of the evidence, which was that the evidence

9    was insufficient to prove an attempted murder.  (Pet. 29, 35-42.)

10        A.  Factual Background

11        The following summary of the proceedings concerning juror

12   number four is taken from the DCA's opinion:

13        The jury retired to deliberate on Thursday, November 9,
          2006 at 2:55 p.m. Their deliberations concluded for
14        that day at 4:24 p.m. The foreperson stated that the
          jury would return Monday morning to continue
15        deliberations. Juror No. 8 was subsequently excused,
          after she explained to the court she would be unable to
16        obtain child care the following week.

17        The jury returned to the court Monday, November 13,
          2006. The alternate juror was sworn, and the court
18        instructed the jurors as follows:

19            "One of your fellow jurors has been excused
              and an alternate juror has been selected to
20            join the jury. Do not consider the
              substitution for any purpose. The alternate
21            juror must participate fully in the
              deliberations that lead to any verdict.
22
              "The People and the defendant have the right
23            to a verdict reached only after full
              participation of the jurors whose votes
24            determine that verdict. This right will only
              be assured if you begin your deliberations
25            again from the beginning. Therefore, you must
              set aside and disregard all past
26            deliberations and begin your deliberations
              all over again. Each of you must disregard
27            the earlier deliberations and decide this
              case as if those earlier deliberations had
28            not taken place."

                                   15

The jury retired to deliberate at 8:50 a.m. Around 11:23 a.m., the court announced that it had received two notes. One note from Jurors No. 4 and 7, marked as Court's Exhibit 12, read:

> "We feel that we are the only two jurors having to explain our decision. We feel it's us against the other ten jurors. Our decision is not being respected. I feel like we are being harassed and intimidated, persuaded to change from verdict to the other. It is very unfair and unprofessional and disrespectful to us. We need your guidance to help us with this further."

The other note, marked Court's Exhibit 13 and signed by the remaining jurors, read:

> "We have not discussed the evidence fully and they have stated they are already decided and one stated he or she will not change his or her mind and feels like we are putting them through the ringer when we ask them to explain their position. We have not polled the jurors yet today."

The court called in the jury foreperson and asked her whether the ten jurors in the jury room "would be willing to talk with and deliberate with and share their views with the two jurors" who were then in the bailiff's office. The foreperson answered: "I don't think any of us that are in there would have a problem with that at all."

The court then called in Juror No. 4. In language similar to its earlier charge to the jury, the court restated the juror's duty to deliberate.[4] The court then asked Juror No. 4 if she felt she was willing to do that. The following colloquy ensued:

---

[4] Specifically, the court told Juror No 4:
"It is your duty in this case to deliberate in the jury room. Of course, you must decide the case for yourself, but only after you've discussed the evidence with the other jurors. Your role is to be an impartial judge of the facts, not to advocate as-not to be an advocate for one side or the other. It's very important that the other jurors hear your views on the case.

"And I'm not asking that you change your mind if you are not-the instruction says, do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because the other jurors disagree with you. It's just that they need to hear your views and it's important that you hear theirs. It is important that all 12 jurors get the chance to deliberate and make up their own mind about the case."

"JUROR NO. FOUR: I can, your Honor. And I've been trying to. But it's-it's difficult when the other ten members are not willing to listen to you and, you know, it's very unprofessional and very disrespectful the way things are being handled. And I'm very disappointed with that.

"THE COURT: Okay. If they take steps to engage in more open discussions with you and listen to you, would you be willing to then go back into the jury room with them and deliberate with them?

"JUROR NO. FOUR: No. Because we don't seem to be getting anywhere. It seems to me that they are trying to persuade myself and the other juror.

"THE COURT: Don't tell us what-just talk about conduct, not what-

"JUROR NO. FOUR: Conduct. It's very, it's very uncomfortable, very uncomfortable, very unprofessional and very hostile in there.

"THE COURT: All right. What should they-what should the foreperson be doing in your opinion in terms of controlling the conduct?

"JUROR NO. FOUR: She should be-I believe she should be telling the other juror members to respect our decision and based upon what we are talking about in there, but that's not happening and we are being attacked basically in there. And it's very uncalled for.

"THE COURT: All right. Are you willing to listen to the other jurors' opinions about the evidence or ideas about what the evidence shows?

"JUROR NO. FOUR: At this point, no. Because we are not-going back to earlier from the last week, we are not getting anywhere.

"THE COURT: Has the jury started all over again with the new juror?

"JUROR NO. FOUR: Yes, we did. That's when I had to buzz the bailiff earlier. Because it was very uncomfortable and I felt like I was the one put on trial earlier and it's just very uncalled for and very unprofessional.

"THE COURT: All right. So if they are willing to listen to your views politely, would you be willing to go back in?

"JUROR NO. FOUR: No. Because I already tried to explain my views about the whole case. I'm not going to say anything else. But they are not willing to listen to what I tried to say and they are just very closed minded and the more I say about my decision on the case the more closed minded they are, and, I mean, there is ten in there. It's like, you know, it's very uncomfortable, very uncomfortable.

"THE COURT: Are you willing to listen to their views?

"JUROR NO. FOUR: No."

Next, the court called in Juror No. 7, and asked if the juror was willing to go back into the jury room if the other jurors were willing to listen to the juror's views. This followed:

"JUROR NO. SEVEN: At this point, your Honor, I'm not sure if it would make a difference. I honestly don't believe it's going to make a difference.

"THE COURT: I don't want you to tell us about the deliberations, meaning I don't want you to tell us what your opinion is or what someone else's opinion is. We are just going to talk about conduct.

"Did the jury start deliberating anew this morning when Juror No. Eight joined them?

"JUROR NO. SEVEN: Yes.

"THE COURT: All right. And has a vote even been taken this morning at all?

"JUROR NO. SEVEN: No.

"THE COURT: All right. What could the other jurors do, what could they change about what they are doing that would then-that you would then be willing to go back and discuss your views and listen to theirs?

"JUROR NO. SEVEN: That's hard to answer. I'm not sure if there is anything they can do. It's people have a difference of opinion and there is no coming together at all. It's a

18

black and a white issue and that's it. And
that's the way I feel. I don't feel like-it
just feels like myself and Juror No. Four are
just being kind of attacked us feeling the
way we do and so I don't know if that will
ever be reasoned out at all putting us back
together. I don't know how to answer that.

"THE COURT: Okay. It is very important that
as a juror you not be an advocate for one
side or the other, but you are an impartial
judge of the facts. It's important that
everyone in the jury room be given the
opportunity to express their views on the
evidence and try to come to an agreement on a
verdict if they can. It is important that
they listen to each other and treat each
other with respect.

"JUROR NO. SEVEN: I believe that everybody is
listening in the room, but I don't believe
the respect has been given.

"THE COURT: How did the other jurors-in terms
of conduct, how do they show lack of respect?
Are they just refusing, are they turning
their back to you when you talk?

"JUROR NO. SEVEN: They are wanting us to
explain ourselves and they are not having to
explain themselves.

"THE COURT: Okay. So if they agree to listen
to your explanation, would you then agree to
listen to theirs? And if they agree to give
their explanation.

"JUROR NO. SEVEN: I would be willing to do
whatever we needed to do to come to some sort
of decision.

"THE COURT: All right. And my understanding,
and maybe it's wrong, just correct me if I'm
wrong, is at some point in time a juror
walked out-buzzed and told the bailiff that
she wanted out of the jury room. Was that you
or Juror No. Four or both of you?

"JUROR NO. SEVEN: Juror Four.

"THE COURT: Juror Four. And then you decided
to go with her?

"JUROR NO. SEVEN: I was called to go with
her.

1

2    "THE COURT: Who called you to go with her?

3    "JUROR NO. SEVEN: Deputy Roth. I believe per
     Juror No. Four wanted.

4    "THE COURT: All right.

5    "JUROR NO. SEVEN: Because our beliefs were
     the same. She wanted me with her just in case
6    I felt the same as she did."

7    The court next called the foreperson back in and spoke
     to her briefly. The foreperson informed the court that
8    after she went back inside the jury room, some comments
     were made that led her to "think that maybe one or two
9    of the jurors may have some hard feelings, some
     animosity and may not be able to take what the other
10   jurors... have to say without hard feelings maybe." The
     court then inquired whether the foreperson felt that if
11   the court again instructed the jurors of their duty to
     deliberate and share their views and listen to the
12   views of others, whether it would be possible to try
     once more to have the 12 jurors deliberate and try to
13   reach a verdict, the foreperson responded that she
     thought it was possible.

14

15   The court then brought Juror No. 4 back for these final
     discussions:

16   "THE COURT: All right. Welcome back.

17   Without talking about the deliberations,
     meaning don't discuss what your opinion is,
18   when I talked to you earlier you talked about
     you made a decision that you had. Don't tell
19   us what the decision was or what the
     disagreement is. But you did seem to mention
20   that something occurred in the jury room that
     prior to your leaving the jury room. Can you
21   tell us what conduct occurred that caused you
     to decide to leave the jury room?

22

23   "JUROR NO. FOUR: Like I said earlier, I was
     feeling attacked and it was very-it's very
24   uncomfortable when you are trying to make
     your point across what your decision is what
25   you believe in or what-you know, just talking
     about the case in general. And I mean, you
26   know, there is ten other people just at you
     and at you and, you know, wait a minute, I
27   don't that (sic) it's very fair for someone
     to sit in there and be treated that way. It's
28   very disrespectful, very uncomfortable. We
     should be working in there together very

20

professional and courteous. You know, this
shouldn't be happening in my opinion, my
point of view.

"THE COURT: If the other jurors were
instructed to be courteous, to listen to your
views and to politely explain their views to
each other, and which include you, would you
be willing to then discuss your views with
them?

"JUROR NO. FOUR: Honestly, your Honor, no.
Because they've already made their decision
and it's like they are trying to persuade us
to change our decision and at this point I'm
not going to.

"THE COURT: Okay.

"JUROR NO. FOUR: It's very uncomfortable.

"THE COURT: And don't tell me what your-has
there been a vote yet today in the jury room?

"JUROR NO. FOUR: No.

"THE COURT: Without telling me what their
decision is, the decision you are referring
to, does that refer to guilt or innocence or
is it a decision about different pieces of
evidence?

"JUROR NO. FOUR: It's both.

"THE COURT: Okay. And just to make the record
clear, what is your position on whether or
not you are willing to go back into the jury
room and deliberate with the other jurors?

"JUROR NO. FOUR: At this point, your Honor, I
don't feel comfortable.

"THE COURT: Okay. At any point will you feel
comfortable going back in there?

"JUROR NO. FOUR: I don't think so. Not the
way I was treated in there. It's just not
right.

"THE COURT: So have you then made a decision
about whether you are going back in the jury
room or not?

"JUROR NO. FOUR: I would not like to go back
in there and discuss it. I mean, it's very

21

> black and white within there. It's all or
> nothing and I feel very uncomfortable.
>
> "THE COURT: If you were directed to go back
> into the jury room and discuss your views
> with the other jurors and listen to theirs,
> would you do that?
>
> "JUROR NO. FOUR: No."

After this discussion, the court excused Juror No. 4,
explaining:

> "Juror No. Four was asked if the Court
> ordered, directed-if the Court directed the
> other nine jurors to listen to her views and
> to share their views with her as well as-I'm
> sorry, the other 11 jurors. If the Court
> instructed the rest of the jurors to share
> their views with this juror and to listen to
> hers would she be willing to then deliberate.
> I think she's made it clear she is not. Even
> if they are polite to her, she is not going
> to do it."

After the next alternate juror was sworn, the court
reinstructed the jury that it was required to begin
deliberations from the beginning. The court also reinstructed the jury

> "Ladies and gentlemen, it is your duty to
> talk with one another and to deliberate in
> the jury room. You should try to agree upon a
> verdict if you can do so. Each of you must
> decide the case for yourself, but only after
> you have discussed the evidence with all of
> the other jurors. Do not hesitate to change
> your mind if you become convinced that you
> are wrong, but do not change your mind just
> because the other jurors disagree with you.
> Keep an open mind and openly exchange your
> thoughts and ideas about this case. Stating
> your opinions too strongly at the beginning
> or immediately announcing how you plan to
> vote might interfere with an open discussion.
> Please treat one another courteously. Your
> role is to be impartial judges of the facts,
> not to act as an advocate for one side or the
> other."

The jury then retired to resume deliberations at 1:52
p.m. and concluded at 4:32 p.m. Deliberations resumed
the following day, at 8:48 a.m. At 10:52 a.m., the
foreperson stated the jury had reached a verdict.

(LD 5, 9-17.)

1

      B.  <u>Analysis</u>

2       The Fourteenth Amendment guarantees a right to trial by jury

3 in all criminal cases that would come within the Sixth

4 Amendment's guarantee if tried in a federal court.  <u>Duncan v.</u>

5 <u>Louisiana</u>, 391 U.S. 145, 149 (9th Cir. 1968).  A defendant's

6 Sixth Amendment right to a fair trial is violated when the

7 "essential feature" of the jury is not preserved.  <u>See,</u> <u>Williams</u>

8 <u>v. Florida</u>, 399 U.S. 78, 100 (1970).  The relevant inquiry

9 concerning whether a particular attribute of a jury is required

10 concerns the function that a particular feature performs and its

11 relation to the purposes of the jury trial.  <u>Id.</u> at 98.  The jury

12 trial functions to prevent oppression by the government through

13 the actions of corrupt or overzealous prosecutors and compliant,

14 biased, or eccentric judges.  <u>Id.</u> at 100.  The essential feature

15 of a jury thus lies in the interposition between the accused and

16 his accuser of the commonsense judgment of a group of lay people,

17 and the community participation and shared responsibility that

18 results from the group's determination of guilt or innocence.

19 <u>Id.</u>

20       An impartial jury consists of jurors who will

21 conscientiously apply the law and find the facts.  <u>Lockhart v.</u>

22 <u>McCree</u>, 476 U.S. 162, 178 (1986).  A juror is impartial only if

23 he can lay aside his opinion and render a verdict based on the

24 evidence presented in court.  <u>Irvin v. Dowd</u>, 366 U.S. 717, 721-22

25 (1961).  Whether a juror is impartial is a question of federal

26 law.  <u>Id.</u> at 722.

27       A defendant in a criminal case is also entitled to a jury

28 that reaches a verdict on the basis of evidence produced at

trial.  Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); Estrada
v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2004).

The Sixth Amendment does not prohibit the mid-deliberation
dismissal of jurors who are unable to serve or who engage in
misconduct.  Williams v. Cavazos, 646 F.3d 626, 642 (9th Cir.
2011), petition for cert. filed 80 BNA USLW 3282 (Oct. 10, 2011)
(No. 11-465) (citing Miller v. Stagner, 757 F.2d 988 (9th Cir.),
amended on other grounds, 768 F.2d 1090 (9th Cir. 1985)).
However, a court may not discharge a juror on account of his
views of the merits of the case.  Id. at 642-43.  This is because
an essential feature of the jury trial right is that only the
group of jurors determine guilt or innocence.  Williams v.
Florida, 399 U.,S. 78, 100 (1970).  Selective dismissal of jurors
based on the views of the merits of the case would obstruct the
jury's independence, eliminate the necessary secrecy of
deliberations, and vitiate the essential role of the jury to act
as a safeguard against the power of the state and the court.
Williams v. Cavazos, 646 F.3d at 643-44.

Accordingly, in deciding whether to discharge a juror mid-
deliberation, the Sixth Amendment analysis requires determining
whether, after an appropriately limited inquiry, it can be said
that there is no reasonable possibility that the juror's
discharge stems fr om his views of the merits, and whether the
grounds on which the trial court relied are valid and
constitutional.  Id. at 644.

In the present case, Petitioner complains of the trial
court's application of Cal. Pen. Code § 1089, which at all
pertinent times has provided that a court may order a juror

24

1  discharged and draw the name of an alternate if at any time

2  during the trial, a juror requests a discharge upon a showing of

3  good cause or dies, becomes ill, or upon other good cause shown

4  to the Court is found to be unable to perform his or her duty.

5      It has been held that Cal. Pen. Code § 1089 is facially

6  valid and retains the "essential feature" of the jury required by

7  the Sixth and Fourteenth Amendments.  Miller v. Stagner, 757 F.2d

8  988, 995.  Thus, in considering a petition for habeas relief

9  concerning application of § 1089 in circumstances involving a

10 "hold-out" juror, this Court must decide whether its application

11 in the circumstances of the case violated Sixth Amendment rights

12 by determining 1) whether good cause existed for the trial court

13 to excuse the juror, and 2) whether Sixth Amendment rights were

14 violated by excusing a juror when it was known that the juror was

15 the lone juror holding out for an acquittal.  Perez v. Marshall,

16 119 F.3d 1422, 1426 (9th Cir. 1997.)

17     On habeas review, a trial court's findings regarding juror

18 fitness are entitled to special deference.  Id.  The trial court

19 is in a superior position to observe the juror's physical

20 appearance and demeanor and thereby to determine the ability to

21 continue deliberating.  Id. at 1427.  Whether a juror has an

22 opinion or disability that disqualifies the juror is a question

23 of historical fact.  Id. at 1426 (citing Patton v. Yount, 467

24 U.S. 1025, 1036-37 (1984)).  Whether a trial court violates a

25 defendant's Sixth Amendment right to a jury trial by excusing a

26 juror for good cause and replacing that juror with an alternate

27 is a question of law.  Id. at 1426.

28     Here, the DCA's reasoned opinion on the issue was as

25

follows:

> Section 1089 provides in part: "If at any time ... a
> juror ... upon ... good cause shown to the court is
> found to be unable to perform his or her duty, ... the
> court may order the juror ... discharged and draw the
> name of an alternate...." The section permits the
> removal of a juror who refuses to deliberate, on the
> theory, that such a juror is "'unable to perform his
> duty.'" (*People v. Cleveland* (2001) 25 Cal.4th 466, 475
> *(Cleveland*.) We review the trial court's determination
> to discharge a juror for an abuse of discretion. (*Id.*
> at p. 474.) The determination will be upheld if it is
> supported by substantial evidence showing the juror's
> refusal to deliberate is a "'demonstrable reality.'"
> (*Id.* at p. 484.)

> Here there is more than enough evidence to show that
> Juror No. 4's refusal to deliberate is a demonstrable
> reality. Juror No. 4 repeatedly expressed her
> unwillingness to deliberate. She unequivocally answered
> "no" six separate times when asked by the court if she
> was willing to return to the jury room and discuss her
> views or listen to the views of the other jurors even
> if they were "willing to listen to [her] views
> politely." "A refusal to deliberate consists of a
> juror's unwillingness to engage in the deliberative
> process; that is, he or she will not participate in
> discussions with fellow jurors by listening to their
> views and by expressing his or her own views."
> (*Cleveland*, supra, 25 Cal.4th at p. 485.)

> Notwithstanding defendant's assertions to the contrary,
> it does not appear Juror No. 4 was improperly
> discharged because she disagreed "with the majority of
> the jury as to what the evidence show[ed], or how the
> law should be applied to the facts." (*Cleveland, supra*,
> 25 Cal.4th at p. 485.) Nor does it appear that after
> she "participated in deliberations for a reasonable
> period of time," Juror No. 4 was discharged "simply
> because [she] express[ed] the belief that further
> discussion [would] not alter her ... views.
> [Citation.]" (*Ibid.*) As the Cleveland court explained,
> such circumstances do not constitute a refusal to
> deliberate and are not grounds for discharge. However,
> this is not what occurred here.

> The jury had not been deliberating long (approximately
> two hours) when Juror No. 4 and Juror No. 7 sent their
> note to the court and expressed their feelings they
> were not being treated with respect by the other
> jurors. It does not appear that at this point, the jury
> had become "hopelessly deadlocked" as defendant asserts
> on appeal. As Juror Nos. 4 and 7 each acknowledged, no
> vote had been taken. Their chief complaint was that

their views were being hostilely received by the other
jurors. Juror No. 7 stated that the jurors were
listening to one another (albeit disrespectfully) and
expressed a willingness to deliberate further if the
jurors were instructed to listen to each other's
explanations. On the other hand, Juror No. 4 flatly
refused to deliberate further no matter what further
instructions were given by the court or whether her
fellow jurors began to treat her with greater
politeness. On this record, we cannot say that the
trial court abused its discretion in discharging Juror
No. 4.

(LD 5, 17-18.)

Here, after two and one-half hours of deliberation and
before any polling occurred, the trial court received the note
describing the sense of conflict and disrespect felt by jurors 4
and 7 as well as the note from the remaining ten jurors
indicating that two jurors had already decided and one would not
change his or her mind despite the evidence not having been fully
discussed and the jury not having been polled.  The court
ascertained that the ten jurors were willing to discuss the case
and deliberate with the two jurors, and it informed juror number
4 of the duty to deliberate and discuss the case and the
importance of not changing her mind just because other jurors
disagreed.  Although juror number 4 initially stated that she
would be willing to deliberate, she later responded that she was
unwilling to deliberate even if the remaining jurors were more
open and listened politely, and she was unwilling to listen to
the other jurors' views or opinions about the evidence.  She
repeatedly stated that she would not be willing to deliberate.

Substantial evidence thus supported the trial court's
finding that juror number 4's unwillingness to deliberate
constituted good cause for her discharge and substitution of an

27

alternate juror.  The present case is analogous with Perez v. Marshall, 119 F.3d 1422, 1426.  In that case, an interview of a juror revealed that although the juror said she would try to continue to deliberate if forced to do so, she repeatedly indicated she was not willing and able to continue as a juror and stated it would be a very emotional experience.  Further, the trial court observed the juror's emotionality, and the jury foreperson opined the juror was an emotional mess.  It was held that substantial evidence supported the finding of good cause. Id.  The court in Perez noted that a juror's emotional condition is different from a strictly physical impairment because it could be related to the juror's viewpoint on the case or to disagreement with other jurors.  However, the court concluded that it was proper to remove the juror where emotional instability prevented her from continuing to perform the essential functions of a juror in the same way that a hearing impairment, mental illness, or poor health condition would. Perez v. Marshall, 119 F.3d at 1427.

Here, juror number 4's withdrawal from the presence of the jurors and her unwillingness to return or consider the evidence or the views of the other jurors concerning the evidence were inconsistent with the essential tasks of a juror, which are to consider the evidence and the views of the other jurors and to render a decision based on the evidence in the case.  Juror number 4's own expressions of her unwillingness to deliberate constituted substantial evidence supporting the trial court's finding of cause.

With respect to Petitioner's assertion that discharge of

28

juror number 4 violated his Sixth Amendment right to jury trial, the record lacks any indication that any diminution of the appropriate function of the jury resulted from the trial court's ruling.  This is consistent with the authority recognizing that a juror's refusal to deliberate could constitute good cause.  See, Williams v. Cavazos, 646 F.3d 626, 648.

Petitioner argues that discharge of the juror deprived him of his right to an impartial jury.  However, because impartiality in a juror requires consideration of the evidence and decision-making based on the evidence, the impartiality of the jury was not diminished by the discharge of a juror who expressed an unwillingness to consider the evidence or the views of the other jurors on the evidence.

Petitioner argues that he was deprived of a juror who simply disagreed with the majority of jurors or viewed the evidence differently from the rest of the jurors, and thus his right to a unanimous jury verdict was violated, and the jury was exposed to coercion.  However, when the trial court discharged juror number 4, deliberations had just begun anew due to the substitution of an alternate, and no vote had yet been taken.  The court's interview with the jurors revealed that a disagreement had arisen.  There is no evidence that the trial court based its decision on the substance of the deliberations; indeed, because deliberations had begun anew and no vote had been taken, there is no basis for an inference that the trial court had any knowledge concerning the view of any juror as to guilt or innocence.  Instead, the judge concluded, based on substantial evidence, that juror number 4 was unwilling to deliberate.  Indeed, another

juror who appeared to have expressed beliefs similar to those held by juror number 4 remained on the jury; however, the significant difference between jurors 4 and 7 was that juror 7 indicated a willingness to continue to deliberate.  The Court concludes that with respect to the positions of the jurors on the question of guilt, this case in not analogous to <u>Perez v. Marshall</u>.  In the present case, there was no reasonable possibility that the juror's discharge stemmed from the juror's views of the merits.  It further appears that the grounds on which the trial court relied are valid and constitutional.

The Court notes that after trial and before imposition of judgment, Petitioner moved for a new trial on the ground that the discharge of juror number 4 resulted in a verdict not based on the expression of opinion on the part of all the jurors and thus violated Cal. Pen. Code § 1181(4), which authorizes a new trial where the verdict has been decided by any means other than a fair expression of opinion on the part of all the jurors.  Juror number 4 declared under penalty of perjury in connection with the motion that she had voted for a finding of not guilty because she did not find the victim credible; ten other jurors continually attacked her during deliberations because of her opinion beginning on the first day, and she informed the trial court of the attacks and that she could no longer be in the same room with them.  (LD 1, 195-97, 202.)

The new trial motion was heard and denied on February 13, 2007.  The trial court stated that the interview of juror number 4 revealed that after an hour and one-half of deliberations, she had expressed a fixed conclusion and an unwillingness to explain

her reasoning to the other jurors.  She had left the jury room, thus physically separating herself from the other jurors and stopping all other deliberations.  She then expressed an unequivocal refusal to return to the jury room to continue deliberations.  The trial court noted that after approximately four hours of further deliberations on that day and the next with the alternate juror substituted for juror number 4, the jury ultimately agreed on charged counts and on most of the special allegations but were unable to reach a verdict on the criminal street gang allegation under Cal. Pen. Code § 186.22(b)(1), as to which the trial court ultimately declared a hung jury.  (LD 15, 2119-20.)  In denying the motion for a new trial, the trial judge concluded as follows:

> The inability to agree on the Penal Code section
> 186 allegation showed that the jury was able to get
> to the point of agreeing to disagree.  This was not
> a case of a juror simply viewing the evidence
> differently from the way the rest of the jury viewed
> it.  This was a case of a juror who was not willing to
> deliberate long enough with her fellow jurors to even
> get to the point of agreeing to disagree.

(LD 15, 2120.)

The Court notes that this motion does not appear to have presented to the state court an issue concerning the Constitution; rather, it appears to have been based on state law. However, it does provide further insight into the decision that was upheld by the DCA and California Supreme Court.

Petitioner contends that juror number four was coerced. Clearly established federal law provides that any criminal defendant being tried by a jury is entitled to the uncoerced verdict of the jury.  <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241

1   (1988).  Whether the comments and conduct of a state trial judge

2   infringe a defendant's due process right to an impartial jury and

3   fair trial turns on whether the trial judge's inquiry would be

4   likely to coerce certain jurors into relinquishing their views in

5   favor of reaching a unanimous decision.  Jiminez v. Myers, 40

6   F.3d 976, 979 (9th Cir. 1993).  Whether a trial court coerced a

7   hold-out juror to join with others to reach a unanimous verdict

8   is a mixed question of law and fact requiring the application of

9   legal principles to the historical facts.  Id.  It must be

10  determined if the court's actions and statements were coercive in

11  the totality of the circumstances.  Id. at 980.  A trial court's

12  neutral inquiry into the division of a jury without other

13  circumstances suggestive of coercion does not deprive a defendant

14  of due process.  Id.

15      Here, the trial court dismissed a juror who refused to

16  deliberate before a vote on guilt was taken.  The trial judge

17  carefully instructed the jurors on the need not to change one's

18  mind just because the other jurors disagreed.  The trial court

19  inquired neutrally concerning the presence of any division of the

20  jury, but the focus of the trial court's examination was the

21  willingness of the juror to deliberate, and not the existence of

22  a conflict among the jurors.  No circumstances of coercion

23  appear.

24      In summary, Petitioner has not shown that the decision of

25  the state court concerning the discharge of juror number 4 for

26  cause resulted in the loss of the jury's impartiality or

27  unanimity, or that it otherwise resulted in any violation of the

28  Petitioner's Sixth and Fourteenth Amendment right to a jury

32

trial.  There was no likelihood that the juror was dismissed for reasons related to the juror's views of the case.  The reasons cited by the trial court were within the bounds of the Constitution.  Petitioner has not shown that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as established by the precedent of the Supreme Court.

Accordingly, Petitioner's claim or claims concerning juror number four should be denied.

VII.   Adequacy of the Trial Court's Investigation of Jury Misconduct

Petitioner argues that the trial court's investigation into the complaints of jurors 4 and 7 concerning the "hostile, disrespectful, and unprofessional conduct" of some of the remaining jurors was so inadequate that it resulted in a violation of his rights to a fair trial and a fair and impartial jury.  (Pet., doc. 1, 43.)

Petitioner acknowledges that state law provides that the determination to investigate possible juror misconduct as well as the ultimate decision whether to retain or discharge a juror rest within the sound discretion of the trial court.  (Id. at 43-44.) However, Petitioner argues that the trial court's investigation was inadequate, and the hearing to determine good cause was not sufficiently complete to permit determination of good cause. Petitioner challenges the trial court's failure to question the jurors about jury misconduct committed against jurors 4 and 7, and specifically to fail to inquire whether some jurors were attempting to coerce the dissenting jurors.  This made it

impossible to make an informed decision concerning the discharge
of juror number 4 or whether the "hold-out" juror was being
improperly pressured by the other jurors.  Petitioner contends
that this is particularly so where the jury "break down" is
eleven to one.  (Id. at 44-47.)

A.  Background

The factual background relating to the circumstances
surrounding the discharge of juror number 4 have been previously
set forth.  With respect to the adequacy of the trial court's
investigation, the DCA's appellate opinion stated the following:

> Defendant contends the court abused its discretion by
> failing to conduct a reasonable inquiry into possible
> jury misconduct after it received reports by Juror No.
> 4 and Juror No. 7 that the other jurors were "engaged
> in hostile, disrespectful, and unprofessional conduct
> toward the two dissenting jurors." Defendant asserts
> that "at the very least, the trial court should have
> inquired into whether some jurors were attempting to
> coerce the dissenting jurors." Defendant contends the
> court's questioning of the foreperson and the two
> jurors was insufficient, and that the court should have
> made some inquiry of the other nine jurors. We disagree,
> and conclude that the court's inquiry was reasonable
> under the circumstances.
>
> The Supreme Court in *Cleveland*, *supra*, cautioned that
> "it often is appropriate for a trial court that
> questions whether all of the jurors are participating
> in deliberations to reinstruct the jurors regarding
> their duty to deliberate and to permit the jury to
> continue deliberations before making further inquiries
> that could intrude upon the sanctity of deliberations."
> (25 Cal.4th at p. 480.) This is precisely what the
> court did here. The court's limited inquiry revealed
> that Juror No. 4 was unwilling to deliberate further
> even if the problem of which she complained could be
> resolved by reinstruction. Rather than conduct further
> inquiry of other jurors and risk intruding on the
> sanctity of deliberations, the court properly excused
> Juror No. 4 and reinstructed the jurors regarding their
> duty to deliberate. Importantly, it appears that the
> court's reinstruction resolved the problem because no
> further complaints of hostility or disrespectful
> conduct by jurors arose. Instead, the jury, *including
> Juror No. 7*, continued to deliberate for over four and

34

half (sic) more hours before finally reaching a verdict, lending further support to the conclusion that, at the early point Juror No. 4 raised her complaints about her fellow jurors, the jury had not yet fully considered all the evidence or deliberated for a reasonable period of time.

In any event, the two jurors' general complaints that they felt uncomfortable in the jury room because their views were being attacked by other jurors, or were being asked to explain themselves more than the other jurors, are not circumstances that warranted a more extensive inquiry by the court. "[J]urors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means. To probe as defendant suggests, in the absence of considerably more cogent evidence of coercion, would '"deprive the jury room of its inherent quality of free expression."' [Citations.] Consequently, the trial court was not required to make the inquiry for which defendant now argues." *(People v. Johnson* (1992) 3 Cal.4th 1183, 1255 [holding the court properly declined to inquire into whether some jurors were coercing the dissenting juror]; see also *Cleveland*, *supra*, 25 Cal.4th at p. 479.)

(LD 5, 18-19.)

B.  <u>Analysis</u>

When a juror is suspected of prejudice or misconduct, the trial judge has the primary obligation to fashion a responsible procedure for ascertaining whether misconduct actually occurred and, if so, whether it was prejudicial. <u>Dyer v. Calderon</u>, 151 F.3d 970, 975 (9th Cir. 1998). An informal, in camera hearing may be adequate for this purpose; due process requires only that all parties be represented and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality or misconduct. <u>Id.</u> at 974-75. Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time there is an issue of jury misconduct that does not involve jury tampering. <u>Tracy v. Palmeteer</u>, 341 F.3d 1037, 1044 (9th Cir.

2003).  Instead, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.  Id.  A trial court's findings are presumed to be correct unless overcome by convincing evidence or undercut by the failure to develop or discover crucial, vital facts that are indispensable to a fair, rounded development of the material facts.  Dyer, 151 F.3d at 976.

Here, the trial court investigated the allegation of juror misconduct by interviewing not only jurors four and seven, but also the jury foreperson.  The court interviewed juror four privately and repeatedly encouraged her to discuss the conduct that made her uncomfortable, which she reported included deliberations being disrespectful, hostile, unprofessional, and causing her to be uncomfortable because the other jurors were not willing to listen and were trying to persuade her and juror number seven.  When the court interviewed juror seven concerning the same matters, juror seven described a difference of opinion and that it felt like she and juror four were "just being kind of attacked."  She reported that she believed that everyone in the room was listening, but she did not believe that respect had been given because the other jurors were wanting them to explain themselves, but the others were not having to explain themselves. When the trial court questioned juror number four a second time, again seeking to know what conduct caused her to decide to leave the jury room, she reported that she was feeling attacked, it was uncomfortable trying to get her point across, and there were ten other people "just at you and at you...."

1    Thus, the trial court questioned the pertinent persons, but

2    those persons reported not any particular actions, but rather

3    their subjective reaction to what was only described as

4    disrespect and the other jurors' efforts at persuasion.  Although

5    juror four said the others were not listening, juror seven said

6    that they were listening but were not sufficiently respectful.

7    The investigation thus uncovered allegations of perceived

8    discourtesy or pointed disagreement, but there was no indication

9    of any serious misconduct or coercion.  Although juror seven

10   indicated that she had shared juror four's views on the case, she

11   contradicted juror four as to the willingness of the other jurors

12   to listen, and she was willing to continue if everyone was

13   willing to give an explanation and listen to each others'

14   explanations.  Further, juror four had separated herself from

15   deliberations and thus had terminated all deliberations; she had

16   indicated an unwillingness to explain her reasoning to the other

17   jurors and to continue deliberations.

18   In summary, it was reasonable for the state court to

19   conclude from the vagueness of juror four's allegations, the

20   disparate reactions of jurors four and seven to the alleged

21   misconduct, and the contradiction between jurors four and seven

22   concerning the willingness of other jurors to listen to juror

23   four's views, that juror four was simply unwilling to perform the

24   tasks of a juror and thus was not the most credible source of

25   information concerning the extent of any discourtesy or

26   disrespect manifested during deliberations.

27   Under the circumstances, it is concluded that during trial

28   the court undertook an investigation reasonably calculated to

37

1   resolve any questions concerning alleged misconduct.

2       The additional information concerning juror number four

3   brought out in her declaration on the motion for new trial

4   concerning her having "voted" for a finding of not guilty would

5   not have changed the result.  It was the uncontradicted position

6   of juror seven and the other jurors, including the foreperson,

7   that no vote had been taken; thus, the present case did not

8   involve a lone, hold-out juror.  In view of the contrary evidence

9   in the record, juror four's post-trial declaration was not so

10  significant that there was a material possibility that the judge

11  would have made a different decision if he had been aware of the

12  facts in question.  See, Dyer v. Calderon, 151 F.3d at 975.

13  Thus, the record supports the conclusion that the investigation

14  was reasonable.

15      Although Petitioner asserts that the court should have

16  interviewed the remaining jurors, there is no basis for

17  concluding that the interview of the foreperson, who reported on

18  the other jurors, did not adequately develop the facts concerning

19  the conduct of the deliberating jurors or the atmosphere of the

20  deliberations.  In view of the statements of the foreperson and

21  juror number seven, including juror seven's willingness to

22  continue deliberations, the court was not required to credit the

23  report of juror four concerning the extent of any alleged

24  misconduct.  Further, juror four repeatedly declined to continue

25  deliberations regardless of the willingness of the other jurors

26  to explain their views or listen to her views.

27      The trial court's investigation was reasonable and revealed

28  no serious misconduct.  This Court will presume that the state

court's findings were correct.  The investigation did not violate Petitioner's right to a trial by jury or to due process of law. The Court concludes that the state court's decision concerning the adequacy of the investigation of the alleged juror misconduct was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, the Court concludes that Petitioner's claim or claims concerning the adequacy of the investigation should be denied.

VIII.   <u>Substitution of Two Alternate Jurors during Deliberations</u>

Petitioner argues that the trial court's substitution of jurors for jurors number four and eight after the case had been submitted to the jury violated Petitioner's rights to trial by an impartial jury and due process of law protected by the Fifth, Sixth, and Fourteenth Amendments as well as the California Constitution.  Petitioner contends that the court erred in failing to declare a mistrial because the jury was inherently incapable of being an impartial tribunal.  Petitioner asserts that the substitutions exposed the jury to outside influences and involved an inherently coercive effect on the new alternates, who were excluded from, and thus necessarily unable to change, the previous deliberations of the others, and therefore were liable to agree prematurely with the regular jurors.  Petitioner relies on general policy grounds as well as psychological research allegedly demonstrating a likelihood that new members facing a group consensus may surrender their own factually correct perceptions in favor of incorrect group conclusions.  Petitioner

1  further argues that the discharged jurors' statements and

2  opinions are no longer a proper basis for the verdict; Petitioner

3  likens the circumstances of the jury in his case to cases in

4  which a juror discusses the case with a third party, and he

5  contends that the post-submission substitutions were

6  presumptively prejudicial.  Petitioner asserts that it is

7  impossible for the regular jurors to disregard prior

8  deliberations, and thus instructions cannot cure the problem.

9          A.  Background

10     On November 9, 2006, the jury began deliberations at 2:55

11  p.m. and concluded at 4:07 p.m.  (LD 1 [Clerk's Transcript],

12  129.)  At the end of the day, the trial court discharged juror

13  number eight and substituted alternate juror number one.  (LD 14,

14  1920.)  When the jury reconvened with alternate juror number one

15  on November 13, 2006, the court instructed the jury not to

16  consider the substitution for any purpose, to set aside and

17  disregard all prior deliberations, to begin deliberations anew,

18  and to decide the case as if the earlier deliberations had not

19  taken place.  (LD 5, 16; LD 14, 1925-26; LD 1, 136.)  The jury

20  deliberated from 8:50 a.m. to 11:23 a.m.  The court then

21  discharged juror four and substituted alternate juror number two

22  in her place.  (LD 5, 16; LD 14, 1939-40; LD 1, 136.)  At 1:50

23  p.m. the court re-instructed the jury on the general duty to

24  deliberate and then stated the following:

25          The alternate juror must participate fully in
            the deliberations that lead to any verdict.  The
26          People and the defendant have the right to a verdict
            reached only after full participation of the jurors
27          whose votes determine that verdict.  This right will
            be assured only if you begin your deliberations again.

28

40

1  So I'm going to read that instruction to you again.
   Begin your deliberations again from the beginning.
2  You must set aside and disregard all past deliberations
   and begin your deliberations all over again. Each of
3  you must disregard the earlier deliberations and
   decide this case as if those earlier deliberations
4  had not taken place.

5  (LD 14, 1942; LD 1, 136.)

6      The jury then began deliberations, requested rereading of

7  the testimony of Officer Reyes, submitted another request

8  concerning testimony, and were excused for the evening at 4:32

9  p.m.  (LD 1, LD 14, 1943-52.)  On November 14, 2006, the jury

10 deliberated from 8:48 a.m. to 10:34 a.m., and then returned the

11 verdicts.  (LD 1, 143.)

12     In its decision, the DCA addressed this issue as follows:

13     Defendant contends the postsubmission substitution of
       jurors allowed under section 1089 violated his
14     constitutional rights. He is mistaken.

15     Section 1089 authorizes substitution of an alternate
       juror before or after final submission of the case to
16     the jury on a showing of good cause. Postsubmission
       substitution does not violate a defendant's right to a
17     trial by jury and its essential element of a unanimous
       verdict provided the trial court instructs the jury to
18     commence deliberations anew. (*People v. Collins* (1976)
       17 Cal.3d 687, 691-694 (*Collins*).) Here, as we have
19     noted, the court instructed the jurors that with the
       replacement of two of the jurors it must "set aside and
20     disregard all past deliberations and begin your
       deliberations all over again." As defendant recognizes,
21     we are bound to follow the Supreme Court's holding in
       *Collins*. (*Auto Equity Sales, Inc. v. Superior Court*
22     (1962) 57 Cal.2d 450, 455.) Despite defendant's
       arguments to the contrary, there is no cogent reason
23     for us to "urge the California Supreme Court to
       reconsider Collins."
24
   (LD 5, 20.)
25
       B.  <u>Analysis</u>
26
27     Insofar as Petitioner claims a violation of his rights under

28 the constitution or decisional law of California, Petitioner has

41

not shown entitlement to relief in this proceeding.  Federal
habeas relief is available to state prisoners only to correct
violations of the United States Constitution, federal laws, or
treaties of the United States.  28 U.S.C. § 2254(a).  Federal
habeas relief is not available to retry a state issue that does
not rise to the level of a federal constitutional violation.
Wilson v. Corcoran, 562 U.S. — , 131 S.Ct. 13, 16 (2010); Estelle
v. McGuire, 502 U.S. 62, 67-68 (1991).  Alleged errors in the
application of state law are not cognizable in federal habeas
corpus.  Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002);
Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  The Court
accepts a state court's interpretation of state law.  Langford v.
Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

Thus, to the extent that Petitioner's claim rests on state
law, Petitioner's claim must be dismissed.

Here, in rejecting Petitioner's contention concerning post-
submission substitution of jurors, the state court relied on
People v. Collins, 17 Cal.3d 687 (1976).  In Collins, the
defendant argued that substitution of a juror after the jury
began deliberating violated his state and federal constitutional
rights to trial by jury.  The California Supreme Court expressly
stated in a footnote that it considered the state constitution to
be controlling because it required a twelve-person jury and a
unanimous verdict in felony prosecutions, whereas the Sixth and
Fourteenth Amendments did not prohibit juries of less than twelve
or require unanimity of the jurors for a verdict.  Collins, 17
Cal.3d at 692 n.3 (citing Williams v. Florida, 399 U.S. 78, 86-
103 (1970); Johnson v. Louisiana, 406 U.S. 356 (1972); and

_Apodaca v. Oregon_, 406 U.S. 404 (1972)).  The court stated that as a consequence, it did not believe that the result it reached failed to satisfy minimum federal constitutional standards.  _Id._

The state court cited no federal constitutional authorities in its analysis of the claim, but rather relied on the state constitution and common law. _See_, _Collins_, 17 Cal.3d at 692-98. The court determined that what the state constitution required was a unanimous verdict of twelve jurors who had heard all the evidence and argument and who together had deliberated to unanimity, and that substitution of alternate jurors for good cause after deliberations had begun was permissible if the jury was instructed that it should set aside and disregard all past deliberations and begin deliberating anew.  _Id._ at 693-95.  It noted in connection with its harmless error analysis that the error was not of federal constitutional dimension.  _Id._ at 698.

Respondent argues that the state court adjudicated the federal constitutional issue on the merits.  Where state court decisions either cite directly to opinions of the United States Supreme Court or to cases which themselves rest on Supreme Court precedent, and the state court holdings are consistent with the reasoning of the cited cases, AEDPA deference applies. _Baker v. City of Blaine_, 221 F.3d 1108, 1112 (9th Cir. 2000).  Respondent contends that the California Supreme Court implicitly determined in _Collins_ that the Sixth and Fourteenth Amendments were not violated by discharge of a juror for cause because the court expressly stated that it was using stricter state standards and that therefore no federal violation could be present.  It appears that the California Supreme Court in _People v. Collins_ determined

on the basis of stricter state standards, which required the unanimous decision of twelve jurors, that there was no violation of the Sixth and Fourteenth Amendments' jury trial right or of fundamental fairness.  By implication, the court held that the Federal Constitution was not violated under the circumstances. Because the trial court in the present case decided the federal issue by relying on People v. Collins, it appears that it also implicitly decided that there was no violation of the Sixth and Fourteenth Amendments or of fundamental fairness.  As such, the decision is entitled to full AEDPA deference.

However, regardless of the degree of deference owed to the state court decision, with respect to the issue of the constitutionality of substitution of an alternate juror after deliberations have begun, the state court decision in the present case was not contrary to, or an unreasonable application of, clearly established federal law.  Petitioner has not cited any Supreme Court precedent determining the question of the constitutionality of substituting a juror during deliberations. The Court's search for authority reveals that the United States Supreme Court has not specifically ruled on the constitutionality of substituting an alternate juror after jury deliberations have begun.  Other courts have also noted this status of the case law. See, Claudio v. Snyder, 68 F.3d 1573, 1575-76 (3d Cir. 1995), cert. den. 517 U.S. 1109 (1996); Venegas v. Uribe, 2011 WL 4104693, *7 (No. CV 10-4850 JHN (FMO), C.D. Cal. July 29, 2011).

The Ninth Circuit Court of Appeals has determined that as a general matter, the Sixth Amendment does not prohibit the mid-deliberation dismissal of jurors who are unable to serve or

44

engage in misconduct.  <u>Williams v. Cavazos</u>, 646 F.3d 626, 642.
It has expressly decided that substitution does not violate
federal constitutional rights because the procedure pursuant to §
Cal. Pen. Code § 1089 preserves the essential feature of the jury
required by the Sixth and Fourteenth Amendments.  <u>Miller v.</u>
<u>Stagner</u>, 757 F.2d 988, 995 (9th Cir.), <u>amended</u> <u>on</u> <u>other</u> <u>grounds</u>,
768 F.2d 1090 (9th Cir. 1985), <u>cert.</u> <u>den.</u>, 475 U.S. 1048-1049
(1986) (citing <u>Williams v. Florida</u>, 399 U.S. 78, 1000 (1970)).

Further, Petitioner has not shown that any prejudice
resulted from the substitution of the juror.  On collateral
review by a federal habeas court of a criminal judgment of a
state court pursuant to the AEDPA, a petitioner is entitled to
relief for a constitutional error at trial where it is shown that
the error resulted in actual prejudice, which in turn is present
where the error had a substantial and injurious effect or
influence in determining the jury's verdict.  <u>Brecht v.</u>
<u>Abrahamson</u>, 507 U.S. 619, 637-38 (1993); <u>Fry v. Pliler</u>, 551 U.S.
112, 116-20 (2007).  This standard of prejudice must be met in
order to obtain relief for an error in the form of exposure of a
jury to extrinsic information.  <u>Mancuso v. Olivarez</u>, 292 F.3d
939, 949-50 (9th Cir. 2002).

Here, there is no showing that any extrinsic evidence was
submitted to the jury.  The bulk of the deliberations occurred
after the alternates began to deliberate, and it was during that
portion of deliberations that the jury requested that significant
portions of the testimony be read back.  The jury was instructed
to begin its deliberations anew.  As a general proposition,
jurors are presumed to follow the instructions given.  <u>See</u>, <u>Weeks</u>

45

1   v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727

2   (2000).  There is no basis for a conclusion that Petitioner

3   suffered any prejudice from the substitution of the alternate

4   jurors.

5       Accordingly, it is concluded that Petitioner has not

6   established that the substitution of two alternate jurors during

7   deliberations was contrary to, or an unreasonable application of,

8   clearly established federal law as determined by the decisions of

9   the Supreme Court as of the time of the relevant state court's

10  decision.

11      Accordingly, the Court concludes that Petitioner's claim

12  should be denied.

13      IX.   Ineffective Assistance of Trial Counsel in Failing
              to Prevent the Jury from Learning of Petitioner's
14            Prior Criminality and Incarceration

15      Petitioner argues that his convictions must be reversed due

16  to the ineffective assistance of trial counsel, who failed to

17  object to testimony by a gang expert concerning Petitioner's

18  prior contacts with law enforcement, prior violent criminality,

19  and incarceration.

20      A.  Background

21      Before trial, Petitioner's counsel moved to exclude expert

22  opinion that Petitioner acted with a specific intent to benefit a

23  criminal street gang, requested bifurcation of the gang

24  enhancement allegation and the allegations based on prior

25  convictions, and sought to exclude use of Petitioner's prior

26  convictions as impeachment evidence.  The court prohibited expert

27  opinion on the issue of specific intent, permitted use of only a

28  prior felony conviction for impeachment, and denied the other

1  motions.   (LD 5, 924, 929, 931-33, 935-38.)

2      The last reasoned decision on the issue of ineffective

3  assistance of counsel was the decision of the DCA on direct

4  appeal, in which the following was stated:

5      IV. Ineffective Assistance of Counsel

6      Next, defendant contends his trial attorney provided
       ineffective assistance of counsel "by failing to
7      prevent the jury from learning the highly inflammatory
       and prejudicial evidence of [defendant's] prior violent
8      criminality and incarceration." Defendant argues that
       defense counsel should have objected to portions of the
9      gang expert's testimony describing defendant's prior
       arrests, incarcerations, and acts of violence, and that
10     the resulting prejudice was incurable, notwithstanding
       the court's limiting instructions. For reasons
11     discussed below, we reject defendant's ineffective
       assistance of counsel claim.

12
       A. Background
13
       As noted above, Herminio Sauceda was the prosecution's
14     gang expert. Sergeant Sauceda opined that defendant was
       a member of the Norteno gang. In forming his opinion,
15     Sergeant Sauceda relied on reports of law enforcement
       contacts with defendant. These contacts were comprised
16     primarily of previous arrests, during which defendant
       either claimed to be affiliated with or associated with
17     the Norteno gang.

18     On this subject, Sergeant Saucedo initially testified
       that defendant first came into contact with Madera
19     County Corrections on two cases in 2006. On both
       occasions, during the classification portion of the
20     booking process, when asked if he was gang-affiliated,
       defendant said yes and identified the Nortenos. He also
21     expressed a preference to be housed with Nortenos.

22     Sergeant Sauceda went on to testify that defendant was
       booked into jail on May 23, 2006, because he had two
23     outstanding warrants for battery and exhibiting a
       firearm. Sergeant Sauceda testified that defendant
24     "went straight to max" due to "his prior history of
       violence against other individuals." Defendant was
25     booked into jail again on June 20, 2006, for attempted
       murder and assault with firearm, but the charges were
26     dismissed. He was subsequently rebooked for attempted
       murder.

27
       The court interrupted this testimony and an unreported
28     sidebar was held. The parties then entered a

                            47

stipulation that "the attempted murder that the officer
was talking about that was dismissed is not a separate
case, but is in fact this case that's tried before the
Court today." The court then instructed the jury as
follows:

> "All right. Ladies and gentleman, this
> witness was asked to testify to certain
> things and I'm now going to ask you to
> disregard those pieces of information.
> Regarding May 2006, this officer was
> questioned about the defendant being booked
> into the county jail. The reason why he was
> booked in the county jail, you are ordered to
> disregard that and not consider that for any
> reason.
>
> "The evidence regarding what the defendant
> said regarding his gang affiliation when he
> was booked into the county jail in May 2006
> remains in evidence.
>
> "As to the June 2006  booking, the evidence
> that was presented regarding why he was
> booked, you are ordered to disregard that
> evidence.
>
> "The evidence regarding what he stated
> regarding his gang affiliation, however,
> remains in evidence.
>
> "Let me explain a little bit more to you in
> the form of an instruction.
>
> "Sergeant Sauceda has been brought here to
> testify to certain opinions and he will be
> testifying to those opinions. He has and he
> will list for you information upon which he
> has based his opinions. As to that
> information that comes from sources outside
> of this trial, in other words, information
> not presented by witnesses in this trial, but
> information that comes from sources outside
> of the trial, you are to consider that
> information only when evaluating the weight
> to be given to the opinion it was used to
> support. You may not consider that
> information for the truth of the matter
> asserted, in other words, as fact, because
> the source of that type of information has
> not testified and been cross-examined."

After the court gave this instruction, Sergeant Saucedo
testified regarding defendant's prior law enforcement
contacts with the Fresno County jail, and revealed the

48

defendant had been booked into that jail on five
occasions between July 2000 and January 2006. During
the booking process, he claimed to be affiliated with
or associated with the Norteno gang.

Sergeant Saucedo further testified that defendant's
background information showed that, while he was living
in Fresno, defendant was involved in a confrontation
with a member of the Bulldog gang, which is a rival of
the Norteno gang. Defendant was charged with stabbing
this individual and slashing his throat, and received a
two-year sentence for the crime.

Other than the forgoing contacts with law enforcement,
Sergeant Saucedo was not aware of any other contacts
which showed defendant's gang membership or gang
affiliation. Defendant has never admitted to being a
full-fledged ("jumped-in") member of the Norteno gang.

At the conclusion of trial, the court instructed the
jury regarding the limited purpose of evidence of gang
activity:

    "You may consider evidence of gang activity
    only for the limited purpose of deciding
    whether:

    "The defendant acted with the intent,
    purpose, and knowledge that are required to
    prove the gang-related enhancement charged;

    "OR

    "The defendant had a motive to commit the
    crimes charged. You may also consider this
    evidence when you evaluate the credibility or
    believability of a witness and when you
    consider the facts and information relied on
    by an expert witness in reaching his or her
    opinion.

    "You may not consider this evidence for any
    other purpose. You may not conclude from this
    evidence that the defendant is a person of
    bad character or that he has a disposition to
    commit crime."

    B. Analysis

Defendant asserts his trial attorney rendered
ineffective assistance of counsel by failing to object
to evidence of his past criminality and arrests
presented by the gang expert's testimony. To establish
this claim, defendant must show "'that counsel's
performance was deficient... [and] that, absent

49

counsel's error, it is reasonably probable that the verdict would have been more favorable to him.' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053.) If the record does not disclose why counsel failed to act, we must reject the contention unless there could be no satisfactory explanation. (*Id.* at p. 1053; *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

On this record, we cannot agree with defendant that trial counsel was ineffective. Trial counsel may well have had a rational tactical reason for not objecting to the gang expert's testimony-namely, that he reasonably believed it to be largely admissible. As defendant recognizes in his argument on appeal, evidence of his gang affiliation was relevant to prove his motive for shooting his cousin and to prove the enhancement allegations that the crimes were committed for the benefit of a street gang (§ 186.22, subd. (b)(1)). As the prosecutor succinctly summarized in closing argument, the People's theory was that "defendant, Eddie Carrillo, is a gang member who tried to murder Carlos Urbano because he dropped out of the gang."

"The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.] '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.] [¶] Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang.' [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) "[T]he motive here was relevant and important, both to the actual crime committed... and to the requisite intent for the enhancement. Case law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.)

Defendant complains that, though relevant, the gang expert's testimony was cumulative. Specifically, defendant argues that, "[i]n light of the expert's testimony that [defendant] claimed or admitted to law enforcement his membership in the [Norteno] gang" evidence of his numerous jail bookings and his incarceration for stabbing a Bulldog gang member was unnecessary and cumulative. We disagree.

Defendant's reliance on *People v. Cardenas* (1982) 31

50

Cal.3d 897, 905 is misplaced. In *Cardenas*, evidence of the defendant's gang membership was admitted to establish possible bias by defense witnesses in favor of the defendant. The prosecutor had sought to prove that the witnesses and the defendant lived in the same neighborhood and had the same circle of friends. But these facts had already been established by ample testimony before the prosecutor began inquiring into the witnesses' gang affiliations. Thus, the evidence of gang membership was cumulative to other testimony establishing the friendship and bias of the defendant's witnesses. Under these circumstances, the gang evidence was of limited probative value, and its admission created a substantial danger of undue prejudice that the defendant had a criminal disposition. (*Id.* at pp. 904-905.)

Here, other than the gang expert's testimony, there was no other evidence of a motive for defendant to shoot his cousin. In addition, the defense disputed the evidence that defendant was a gang member.FN3 Evidence of defendant's prior law enforcement contacts and attack on a member of a rival gang was highly probative to the issue of whether defendant was, in fact, a member of the Norteno gang, which was the only motive offered for the shooting, and the basis of the gang enhancements. Trial counsel could reasonably determine that any objection to the testimony on the ground the evidence was unduly prejudicial or cumulative would be futile. Thus, defendant has failed to establish that his trial counsel was ineffective. As the California Supreme Court has observed, "[a] mere failure to object to evidence or argument seldom establishes counsel's incompetence. [Citations.]" (*People v. Frierson* (1991) 53 Cal.3d 730, 747.)

> FN3. Defense counsel argued: "Well, if he's a hard core gang member and there is this green light list and he's going to do the hit, that's big news for the gang. Why turn yourself in? You got a state network gang where you can go hide out. There is no reason to do it. They'll hide you and you can move up in the gang. But instead he finds out that they are looking for him, he goes, turns himself in and says, 'You making a big deal about this?' Well, yeah, they are making a big deal about it because he's not the shooter. [¶] ... [¶] Mr. Carrillo doesn't have any gang history. He does have a prior conviction for assault. That didn't happen until he was in his late 20s. He's 29 now. Why isn't there this gang history of him running with gangs and doing all this stuff? It's because he's not a gang member...."

In any event, we are satisfied that even had trial
counsel successfully objected to the parts of the
expert's testimony about which defendant specifically
complains, there is no reasonable probability of a
different result. As the People point out, the court
took great pains to ensure that the jury would not
convict defendant of the current offenses based on
evidence of his prior criminality and arrests by giving
limiting instructions regarding the nature of the
evidence and the purpose for which it could be
considered, which we presume the jury followed. *(People
v. Sanchez* (2001) 26 Cal.4th 834, 852.) The court also
admonished the jury to disregard Sergeant Saucedo's
testimony regarding why defendant was booked into jail.
In the charge to the jury at the close of evidence, the
jury was instructed to disregard any testimony the
court ordered stricken or told the jury to disregard.

Moreover, no one suggested that defendant should be
convicted of the instant crimes because his previous
arrests and incarcerations showed a propensity for
criminality. Indeed, in the prosecutor's closing
argument, only brief mention was made of the gang
expert's testimony regarding defendant's prior contacts
with law enforcement,FN4 and no reference at all was
made of the underlying conduct which defendant asserts
was the most prejudicial aspect of the gang expert's
testimony. Finally, as noted above, the jurors were
unable to reach a verdict on the gang enhancements,
thus suggesting the gang expert's testimony was not as
compelling or inflammatory as defendant characterizes
it on appeal. These circumstances, combined with the
uncontroverted, eye-witness identification of defendant
by the victim, compel us to conclude that trial
counsel's failure to object to the complained of
portions of the gang expert's testimony did not result
in prejudicially ineffective assistance of counsel.

> FN4. In this regard, the prosecutor argued:
> "Sergeant Sauceda, you heard him testify
> giving his expert opinion that the defendant
> is in fact a Norteno Criminal Street Gang
> member. And he based his opinion on numerous
> contacts that the defendant has had with law
> enforcement and showing gang affiliation and
> gang membership and also where the defendant
> has admitted to gang membership or
> affiliation with Nortenos on at least four
> different occasions when he was going through the classification p

(LD 5, 20-26.)

B.   Analysis

The Supreme Court has described the high bar presented by

52

§ 2254(d)(1) for prevailing on a claim of ineffective assistance of counsel:

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687 [104 S.Ct. 2052].

"With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ...

"'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ----, ---- [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333,

n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, -U.S. -, 131 S.Ct. 733, 739-40 (2011) (quoting Harrington v. Richter, –U.S.–, 131 S.Ct. 770 (2011)).

Here, the state court articulated the correct standard for determining whether Petitioner had suffered a Sixth Amendment violation from the alleged ineffective assistance of counsel.

At all pertinent times, Cal. Evid. Code § 352 has provided as follows:

The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

It is established in California that evidence of uncharged offenses is so potentially prejudicial that its admission requires extremely careful analysis, and it is generally admissible only if it has substantial probative value. People v. Ewoldt, 7 Cal.4th 380, 404 (1994).

California law concerning the admissibility of gang evidence has been summarized as follows:

California courts have long recognized the potentially prejudicial effect of gang membership. As one California Court of Appeal observed: "[I]t is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from 'Our Little Gang' series. The word 'gang' ...

54

connotes opprobrious implications.... [T]he word 'gang' takes on a sinister meaning when it is associated with activities." (*People v. Perez* (1981) 114 Cal.App.3d 470, 479, 170 Cal.Rptr. 619.) Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of such evidence if it is only tangentially relevant to the charged offenses. (*People v. Cox* (1991) 53 Cal.3d 618, 660, 280 Cal.Rptr. 692, 809 P.2d 351.) In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047, 16 Cal.Rptr.3d 880, 94 P.3d 1080.) "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449, 69 Cal.Rptr.2d 16.)

Thus, as general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192, 24 Cal.Rptr.3d 887.) Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. *(People v. Williams* (1997) 16 Cal.4th 153, 193, 66 Cal.Rptr.2d 123, 940 P.2d 710; see generally Evid.Code, § 352.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez*, supra, 33 Cal.4th at p. 1049, 16 Cal.Rptr.3d 880, 94 P.3d 1080.) Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. (*People v. Williams*, supra, 16 Cal.4th at p. 193, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. Carter* (2003) 30 Cal.4th 1166, 1194, 135 Cal.Rptr.2d 553, 70 P.3d 981 [evidence of defendant's gang membership although relevant to motive or identity creates a risk the jury will improperly infer defendant has a criminal disposition and is therefore guilty of the charged offense and thus must be carefully scrutinized].)

People v. Albarran, 149 Cal.App.4th 214, 223 (2007)

1    Thus, evidence related to gang membership is not insulated
2 from the general rule that all relevant evidence is admissible if
3 it is relevant to a material issue in the case other than
4 character, is not more prejudicial than probative, and is not
5 cumulative.  People v. Samaniego, 172 Cal.App.4th 1148, 1167-68
6 (2009).  Gang evidence is relevant and admissible when it is
7 admitted to prove motive; because motive it ordinarily the
8 incentive for criminal behavior, its probative value generally
9 exceeds its prejudicial effect, and wide latitude is permitted in
10 admitting evidence of its existence.  Id. at 1167-68.

11    Here, Petitioner's ineffective assistance claim concerns the
12 introduction of evidence of an arrest on warrants for battery and
13 exhibiting a firearm in May 2006, his placement in "max" security
14 due to a prior history of violence against others, booking on the
15 charged offenses, his having claimed to have been affiliated or
16 associated with the Norteno gang on five occasions between July
17 2000 and January 2006 when he was booked into jail, and his prior
18 stabbing and slashing the throat of a member of a rival gang in
19 Fresno which resulted in a conviction and two-year sentence.
20 Petitioner argues that this evidence was unduly prejudicial and
21 cumulative.

22    Evidence of gang affiliation was relevant in the present
23 case to prove not only motive, but also to prove the gang
24 enhancement that was charged pursuant to Cal. Pen. Code
25 § 186.22(b)(1), which at the time of Petitioner's offense in June
26 2006 provided for enhanced punishment for a person convicted of a
27 felony "committed for the benefit of, at the direction of, or in
28 association with any criminal street gang, with the specific

intent to promote, further, or assist in any criminal conduct by gang members...."  2005 Cal. Stats., ch. 482, § 1.

Petitioner's having been booked on the charged offenses could not have been prejudicial because the jury necessarily knew that Petitioner had been charged with the offenses.  Evidence that he had been arrested on previous occasions and had claimed to have been associated with the Norteno gang at those times was relevant to motive.  Information that Petitioner's prior claims of gang affiliation had been made on the occasions of previous arrests was strongly probative because the evidence supported an inference that Petitioner sensed danger if not housed with other gang associates, and thus Petitioner had a significant association with the gang.  Although the mere fact of prior arrests could be prejudicial, it was not unreasonable for the state court to conclude that any prejudice was outweighed by the probative value of the full context of Petitioner's previous claims of gang association.

To the extent that any prejudicial inferences could have been drawn from information concerning the crimes for which Petitioner had previously been arrested, the trial court specifically instructed the jury not to consider the reasons why he was booked into jail in May and June 2006 for any reason, and specifically not to consider it for the truth of the matter asserted or as fact.

Evidence that Petitioner had previously stabbed and slashed the throat of a rival gang member and had suffered a conviction and sentence for that crime was highly relevant to show the gang motivation for the charged offenses.  The state court correctly

57

1  reasoned that no motive other than the gang-related one was
2  proven or suggested, and further that the gang testimony was
3  critical evidence of the gang motivation.  The state court
4  correctly noted the argument of Petitioner's trial counsel
5  disputing Petitioner's gang membership.  The evidence of motive
6  was circumstantial, so it was not unreasonable to admit multiple
7  pieces of evidence from different sources concerning Petitioner's
8  motivation.

9     With respect to the potential for prejudice from the prior
10 offense, although Petitioner's prior conviction involving
11 slashing the throat of a rival gang member involved a violent act
12 that was potentially inflammatory in nature, it was not any more
13 violent or callous than the charged offense of firing multiple
14 bullets at close range into an unarmed family member.  In this
15 respect, the potential for prejudice was decreased because it is
16 less likely that the jury would disbelieve the evidence
17 concerning the charged offenses but nevertheless convict based on
18 the uncharged offenses.  Cf., People v. Ewoldt, 7 Cal.4th 380,
19 405 (1994).  Prejudice is also somewhat less because the
20 uncharged act also resulted in a conviction, and thus there was
21 less potential for confusion of the issues.  Id.

22    Further, the trial court ultimately re-instructed the jury
23 to consider evidence of gang activity only for the limited
24 purpose of deciding the state of mind required to prove the gang-
25 related enhancement or to show motive, and not to consider it for
26 any other purpose, including to infer that Petitioner had a bad
27 character or was disposed to commit a crime.  Where the trial
28 court properly instructs a jury that it is not permitted to

consider gang evidence to prove that the accused had a bad character or was predisposed to commit a crime, it will be presumed the jury follows the court's instruction in the absence of any showing to the contrary.  People v. Williams, 170 Cal.App.4th 587, 613 (2009) (citing People v. Yeoman, 31 Cal.4th 93, 139 (2003)).  Here, there is no showing to the contrary, so it is concluded that the instruction cured any harm.

Further, where gang evidence is directly relevant to, and is directly probative of, gang enhancement and substantive gang crime allegations, and where the jury found not true a gang enhancement allegation, it may be concluded that the jury did not accept the gang evidence and prior crimes evidence uncritically. People v. Williams, 170 Cal.App.4th at 612-13.  The jury here did not find the gang enhancement allegation true.  This fact provides some support for a conclusion that the jury did not engage in a prohibited inference that Petitioner had a criminal disposition and thus committed the charged offenses.  Id.

Further, the state court correctly considered the fact that Petitioner's conviction on the substantive charge was supported by the victim's uncontroverted, eye-witness identification.  The conviction was based on very strong, direct evidence.  Therefore, the state court reasonably concluded that Petitioner could not have shown that a different result was more probable had counsel objected, and thus that no prejudice ensued from counsel's omissions.

The Court thus concludes that the record did not foreclose the possibility that Petitioner's trial counsel had a strategic or tactical reason for not objecting further to all the gang

1 evidence because under California law, such objections were
2 likely to be overruled, and, in any event, any harm was cured by
3 the court's instructions.  The state court's decision that trial
4 counsel was thus not ineffective was not contrary to, or an
5 unreasonable application of, clearly established federal law
6 concerning the ineffective assistance of counsel.

7     Petitioner also argues that admission of the prior crimes
8 evidence violated his rights to due process of law and a fair
9 trial guaranteed by the Fifth and Fourteenth Amendments.

10    The admission of evidence does not provide a basis for
11 habeas relief unless its admission was arbitrary or so
12 prejudicial that it rendered the trial fundamentally unfair in
13 violation of due process.  Estelle v. GcGuire, 502 U.S. 62, 67-69
14 (1991); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.
15 2009).  Further, even the clearly erroneous admission of evidence
16 that renders a trial fundamentally unfair may not permit the
17 grant of habeas relief unless forbidden by clearly established
18 federal law as established by the Supreme Court.  Id.  The
19 Supreme Court has not yet made a clear ruling that admission of
20 irrelevant or overtly prejudicial evidence constitutes a due
21 process violation sufficient to warrant issuance of the writ, and
22 absent such clearly established federal law, it cannot be
23 concluded that the state court's ruling was an unreasonable
24 application.  Holley v. Yarborough, 568 F.3d at 1101 (citing
25 Carey v. Musladin, 549 U.S. 70, 77 (2006)).

26    With respect to prior crimes evidence, the Supreme Court has
27 held that admission of evidence of prior convictions during the
28 guilt phase was not a violation of due process where there was a

valid state purpose (there, enforcement of a habitual offender statute), and no sufficient danger of unfairness, as when the trial court instructed the jury to limit its use of the evidence to sentence enhancement, and the trial court retained discretion to limit or prohibit the admission of particularly prejudicial evidence even though it was admissible under an accepted rule of evidence. Spencer v. Texas, 385 U.S. 554, 562-64 (1983). The Court has noted that the common law has permitted such evidence to be admitted where it is probative of intent, an element of the crime, motive, a system of criminal activity, or when the defendant has testified or has otherwise raised the issue of his character. Id. at 560-61. The Court has further recognized that any unfairness resulting from admitting prior convictions is more often than not balanced by their probative value. Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). The Court has left open the issue of whether or not the Due Process Clause is violated by use of prior crimes evidence to show propensity to commit a crime. Estelle v. McGuire, 502 U.S. 62, 75 n.5.

Given this state of the law, a state court decision that Petitioner's counsel was not ineffective in failing to object to the prior crimes evidence was not contrary to, or an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1).

It has been held in this circuit that evidence introduced by the prosecution often raises more than one inference, and where some of the inferences are permissible, it is up to the jury to draw the inferences in light of the court's instructions. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Admission of

61

1  evidence violates due process only if there are no permissible

2  inferences that jury may draw from it, and the evidence is of

3  such quality as necessarily prevents a fair trial.  <u>Boyde v.</u>

4  <u>Brown</u>, 404 F.3d 1159, 1172-73 (9th Cir. 2005) (quoting <u>Jammal v.</u>

5  <u>Van de Kamp</u>, 926 F.2d 918, 920).

6      Thus, admission of evidence of "other acts" that a defendant

7  contends was unduly prejudicial is a violation of due process

8  only where there are no permissible inferences that the jury may

9  draw from the evidence.  <u>Windham v. Merkle</u>, 163 F.3d 1092, 1103

10  (9th Cir. 1998).  Admission of the testimony of a law enforcement

11  officer testifying as a gang expert has been held not to violate

12  due process where the evidence consisted of information

13  concerning gang factions in the area of the crimes, retaliatory

14  behavior of the gangs, and membership therein where the evidence

15  was relevant to prove a motive for the crimes, a fact of

16  consequence, and thus did not lead only to impermissible

17  inferences about the defendant's character.  <u>Id.</u>

18      In summary, it is therefore concluded that Petitioner has

19  not shown that the state court's decision that counsel was not

20  prejudicially ineffective was contrary to, or an unreasonable

21  application of, clearly established federal law.

22      X.  <u>Insufficiency of the Evidence to Support the Finding</u>
           <u>of a Prior Serious Felony Conviction</u>

23

24      Petitioner argues that the evidence was insufficient to

25  support the trial court's conclusion that Petitioner's conviction

26  in 2001 of assault in violation of Cal. Pen. Code § 245(a)(1) was

27  a conviction of a serious felony within the meaning of Cal. Pen.

28  Code § 1192.7(c) and thus a "strike" for the purpose of

California's Three Strikes Law.

Respondent argues that Petitioner failed to exhaust his state court remedies as to this claim and that the claim is "presumptively unexhausted." (Doc. 23, 37:4-5.) Respondent further contends that this Court is authorized to deny relief on the merits because it is apparent that Petitioner has not presented a colorable federal claim.

> A.   Exhaustion

Whether a federal claim was fairly presented to a state court is an issue of federal law, not state law. <u>Scott v. Schriro</u>, 567 F.3d 573, 582 (9th Cir. 2009).

A petitioner who is in state custody and wishes to challenge collaterally a conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state court with the necessary jurisdiction a full and fair opportunity to consider each claim before presenting it to the federal court, and demonstrating that no state remedy remains available. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Johnson v. Zenon</u>, 88 F.3d 828, 829 (9th Cir. 1996).

It is established that to satisfy the exhaustion requirement, the petitioner must have fairly presented the substance of his federal claim to the state courts. This means that a petition must apprise the state court that a claim pursuant to the United States Constitution is being made and describe both the operative facts and the federal legal theory on which his claim is based so that the state court could have a fair opportunity to apply controlling legal principles to the

1 facts bearing upon his constitutional claim.   <u>Castillo v.</u>
2 <u>McFadden</u>, 399 F.3d 993, 998-99 (9th Cir. 2005).   Generally, a
3 petitioner must have presented his federal constitutional issue
4 before the appropriate state court within the four corners of his
5 appellate briefing in order to fairly present an issue.   <u>Id.</u> at
6 1000.   Citation to either a federal or state case involving the
7 legal standard for a federal constitutional violation is
8 sufficient to establish exhaustion.   <u>Id.</u> at 999 (citing <u>Lyons v.</u>
9 <u>Crawford</u>, 232 F.3d 666, 670 (2000), as modified by 247 F.3d 904
10 (9th Cir. 2001)).

11      Here, in his petition for review filed in the California
12 Supreme Court, Petitioner argued that the finding that his prior
13 conviction of assault with a deadly weapon was a serious felony
14 within the meaning of Cal. Pen. Code § 1192.7(c) was not
15 supported by sufficient evidence, and his argument included a
16 citation to <u>Jackson v. Virginia</u>, 433 U.S. 307, 317-19 (1979), as
17 the authority for the legal standard of sufficiency of the
18 evidence.  (LD 6, 5-6.)   Petitioner further stated the factual
19 basis of his argument of insufficiency.  (<u>Id.</u> at 6-7.)

20      Accordingly, the Court concludes that Petitioner fairly
21 presented the claim to the highest state court in the sense that
22 he alerted the court to the presence of a federal claim by
23 stating the facts and the legal theory, and by citing federal
24 authority containing the legal standard for the claim.

25      Respondent appears to argue that the claim was nevertheless
26 not fairly presented because Petitioner first raised the claim as
27 a federal claim in the California Supreme Court and failed to
28 raise it as such before the DCA; thus, the state's highest court

1 would not have considered the federal claim in the first instance
2 on a petition for discretionary review, and the claim was
3 procedurally barred or unexhausted. However, reference to the
4 Petitioner's opening brief in the DCA shows that Petitioner there
5 raised the same claim and cited to the <u>Jackson</u> case as authority
6 for the operative legal standard of sufficiency of the evidence.
7 (LD 2, 49-50.)

8 Accordingly, it is concluded that the record does not bear
9 out the representation of Respondent's counsel that "Petitioner's
10 argument before the California Court of Appeal was based solely
11 on state law grounds." (Doc. 23, 30:5-6.) The fact that the DCA
12 may have decided the issue without reference to federal authority
13 does not undercut the Petitioner's presentation of the claim as
14 including a federal claim.

15 B. <u>Sufficiency of the Evidence</u>

16 Petitioner claims that his sentence was improperly enhanced
17 on the basis of his having suffered a prior serious felony
18 conviction within the meaning of Cal. Pen. Code § 1192.7(c)
19 because the evidence presented by the prosecution was
20 insufficient to show that the prior conviction was a serious
21 felony.

22 The Due Process Clause of the Fourteenth Amendment
23 guarantees that a criminal defendant may be convicted only "upon
24 proof beyond a reasonable doubt of every fact necessary to
25 constitute the crime with which he is charged." <u>In re Winship</u>,
26 397 U.S. 358, 364 (1970). A habeas petitioner challenging the
27 sufficiency of the evidence to support his state criminal
28 conviction may obtain relief only if "it is found that upon the

1  record evidence adduced at the trial no rational trier of fact

2  could have found proof of guilt beyond a reasonable doubt."

3  <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).

4      In the present case, California law requires that a prior

5  conviction be proved beyond a reasonable doubt.  <u>See</u>, <u>People v.</u>

6  <u>Towers</u>, 150 Cal.App.4th 1273, 1277 (2007).  However, the United

7  States Supreme Court has not determined that the standards of

8  <u>Jackson v. Virginia</u> and <u>In re Winship</u> concerning the standard of

9  proof and the sufficiency of the evidence apply to the

10 determination of whether or not a defendant has suffered a prior

11 conviction that is used to enhance a sentence.  <u>See</u>, <u>Dretke v.</u>

12 <u>Haley</u>, 541 U.S. 386, 395 (2004) (noting that various lower

13 federal courts had assumed that <u>Jackson's</u> standards for

14 sufficiency of the evidence applied to recidivist enhancements

15 but that the Supreme Court had not extended the protections of <u>In</u>

16 <u>re Winship</u>, 397 U.S. 358, to proof of prior convictions used to

17 support recidivist sentencing enhancements); <u>Apprendi v. New</u>

18 <u>Jersey</u>, 530 U.S. 466, 490 (2000) (holding that the fact of a

19 prior conviction is excepted from the general rule that any fact

20 that increases the penalty for a crime beyond the prescribed

21 statutory maximum must be submitted to a jury and proved beyond a

22 reasonable doubt); <u>Almendarez-Torres v. United States</u>, 523 U.S.

23 224 (1998) (holding that treating recidivism solely as a

24 sentencing factor did not offend due process, and expressly

25 confirming that <u>In re Winship</u> did not govern because it applied

26 only to the elements of a crime); <u>McMillan v. Pennsylvania</u>, 477

27 U.S. 79, 84-91 (1986) (holding that the Due Process Clause does

28 not guarantee a criminal defendant the right to a finding beyond

1  a reasonable doubt of facts that are not elements of the crime
2  and are relevant only for purposes of sentencing).

3      This being the case, it is concluded that Petitioner has not
4  shown that the denial of his claim was contrary to, or an
5  unreasonable application of, clearly established federal law
6  within the meaning of  28 U.S.C. § 2254(d)(1).  See, Carey v.
7  Musladin, 549 U.S. 70, 77 (2006).

8      However, the Court notes that without expressly considering
9  the applicability of Jackson v. Virginia, the Court of Appeals
10 for the Ninth Circuit has used the Jackson v. Virginia standard
11 to analyze the sufficiency of the evidence to support the trier
12 of fact's findings of gang enhancements used to increase a
13 sentence pursuant to Cal. Pen. Code § 186.22(b)(1).  See, e.g.,
14 Emery v. Clark, 643 F.3d 1210, 1213-16 (9th Cir. 2011).  To the
15 extent that this might be interpreted as an implicit
16 determination that Jackson is applicable under Supreme Court
17 precedent, the Court concludes that under the standard of Jackson
18 v. Virginia, Petitioner has not shown that the state court
19 decision on the insufficiency of the evidence was contrary to, or
20 an unreasonable application of, clearly established federal law.

21     The DCA's decision concerning the issue was based on state
22 law and was as follows:

23     V. Proof that Prior Assault Conviction Qualified as a
           Serious Felony
24
25     Finally, defendant contends there is insufficient
       evidence to show that his prior conviction of violating
       section 245, subdivision (a)(1) qualified as a serious
26     felony within the meaning of section 1192.7,
       subdivision (c). We disagree.
27
28     Section 1192.7, subdivision (c) enumerates serious
       felonies. Included in that list is "assault with a

67

deadly weapon ... in violation of Section 245." (§ 1192.7, subd. (c)(31).) But a conviction under section 245, subdivision (a)(1) can be based either on "an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." (§ 245, subd. (a)(1).) Consequently a conviction for an assault under that section could qualify as a serious felony under section 1192.7, subdivision (c)(31) if committed with a deadly weapon, but would not if committed with some other means of force likely to produce great bodily harm. Here, we consider the sufficiency of the abstract of judgment to prove that defendant's prior assault conviction in 2001 involved the use of a deadly weapon.

Defendant relies, in part, on a split of opinion between two divisions of the Second District Court of Appeal to argue that the abstract of judgment is insufficient to prove that his assault conviction included the use of a deadly weapon. He urges us to disregard Division Five's holding in *People v. Luna* (2003) 113 Cal.App.4th 395 (*Luna*) (review denied Feb. 4, 2004, S121415) that an abstract of judgment noting a conviction under section 245, subdivision (a)(1) for "'ASSLT GBI W/DLY WPN'" was sufficient to uphold a finding of a prior strike. Instead, defendant asks us to follow Division Six's conclusion that an abstract of judgment bearing a similar notation, "'ASSAULT GBI W/DEADLY WEAPON,'" was insufficient to support an enhanced sentence under the three strikes law. *(People v. Banuelos* (2005) 130 Cal.App.4th 601, 605 (*Banuelos*).) FN5

> FN5. Defendant recognizes this issue is currently before the California Supreme Court in People v. Delgado (review granted Mar. 29, 2006, S141282).

But the issue presented in *Luna* and *Banuelos* is not implicated here. That is so because the abstract of judgment in this case does not include reference to both qualifying and unqualifying types of assault under section 245. The court in *Banuelos*, supra, 130 Cal.App.4th at page 606 refused to follow the *Luna* decision because the abstracts of judgment in both cases referenced the crime "as 'ASSAULT GBI W/DEADLY WEAPON' .... [which] could be read to mean that the assault was committed both by means of force likely to produce great bodily injury and with a deadly weapon, it could also be construed as a shorthand description of the criminal conduct covered by section 245, subdivision (a)(1)...." Of the description in the abstract of judgment analyzed in *Luna*, "'ASSLT GBI W/DL[Y] WPN,'" the *Banuelos* court stated, "we cannot be

68

confident that this abbreviated description of a statute prohibiting two types of criminal conduct was anything more than that particular court clerk's shorthand method of referring to the statute under which appellant was convicted." (*Banuelos*, *supra*, 130 Cal.App.4th at p. 606.)

No such ambiguity exists in the proof proffered below. The abstract of judgment stated that the conviction of section 245, subdivision (a)(1) was for an "ASSAULT WITH A DEADLY WEAPON." It did not give rise to the possibility that the conviction might instead have been for force likely to lead to great bodily harm. Defendant's argument requires us to presume that the court clerk incorrectly prepared the abstract of judgment. But the evidentiary presumption is to the contrary. Evidence Code section 664 provides: "It is presumed that official duty has been regularly performed." That presumption applies to the duties of court clerks. (See *In re Lopez* (1970) 2 Cal.3d 141, 146 [presumption that preparing docket entry was regularly performed]; *Smith v. Smith* (1958) 157 Cal.App.2d 658, 662 [presumption that minutes of court are correct].) Defendant had the opportunity to rebut this presumption by providing evidence that his prior conviction under section 245, subdivision (a) was not for assault with a deadly weapon. He presented no such evidence.

The Supreme Court's holding in *People v. Rodriguez* (1998) 17 Cal.4th 253 *(Rodriguez)* is likewise not implicated here. Like *Luna* and *Banuelos*, that case analyzed the sufficiency of an abstract of judgment with the ambiguous notation "'ASLT GBI/DLY WPN.'" (*Rodriguez*, *supra*, 17 Cal.4th at p. 261.) The court ruled that such an annotation merely "reflected the statutory language," proving "nothing more than the least adjudicated elements of the charged offense." (*Id.* at pp. 261, 262.) But the annotation in the abstract of judgment at issue here includes only one of the two section 245, subdivision (a)(1) assaults. Thus, it serves as proof of the elements of the specifically listed offense and not of the lesser of two possible offenses, as argued by defendant. Consequently, the trial court properly found that defendant's 2001 violation of section 245, subdivision (a)(1), assault with a deadly weapon, qualified as a serious felony.

(LD 5, 26-29.)

In determining the sufficiency of the evidence, all evidence must be considered in the light that is the most favorable to the prosecution.  <u>Jackson</u>, 443 U.S. at 319.  It must be recognized

1  that it is the trier of fact's responsibility to resolve
2  conflicting testimony, weigh evidence, and draw reasonable
3  inferences from the facts; thus, it must be assumed that the
4  trier resolved all conflicts in a manner that supports the
5  verdict.  Id.  The relevant inquiry is not whether the evidence
6  excludes every hypothesis except guilt, but rather whether the
7  jury could reasonably arrive at its verdict.  United States v.
8  Mares, 940 F.2d 455, 458 (9th Cir. 1991).  Circumstantial
9  evidence and the inferences reasonably drawn therefrom can be
10 sufficient to prove any fact and to sustain a conviction,
11 although mere suspicion or speculation does not rise to the level
12 of sufficient evidence.  United States v. Lennick, 18 F.3d 814,
13 820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514
14 (9th Cir. 1990); see, Jones v. Wood, 207 F.3d 557, 563 (9th Cir.
15 2000).  The court must base its determination of the sufficiency
16 of the evidence from a review of the record.  Jackson at 324.

17     The Jackson standard must be applied with reference to the
18 substantive elements of the criminal offense as defined by state
19 law.  Jackson, 443 U.S. at 324 n.16.  Further, under the AEDPA,
20 federal courts must apply the standards of Jackson with an
21 additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262,
22 1274 (9th Cir. 2005).  This Court thus asks whether the state
23 court decision being reviewed reflected an objectively
24 unreasonable application of Jackson to the facts of the case.
25 Id. at 1275.

26     The evidence before the state courts included the abstract
27 of judgment, which reflected a conviction of Cal. Pen. Code
28 § 245(a)(1), assault with a deadly weapon.  The abstract was an

70

unambiguous indication that Petitioner was convicted of a felony that came within Cal. Pen. Code § 1192.7(c)(31), which enumerated the felonies considered to be serious felonies and included assault with a deadly weapon in violation of § 245(a)(1). Although § 245(a)(1) defined two separate felonies, only assault with a deadly weapon was specified as a serious felony in § 1192.7(c)(31). However, in considering the abstract of judgment, the state court expressly relied on a presumption that official duty was regularly performed, a presumption which state law recognized was applicable to a court clerk's duty to prepare minutes and docket entries, matters essentially indistinguishable from preparation of an abstract of judgment. See, In re Lopez, 2 Cal.3d 141, 146 (1970); Smith v. Smith, 157 Cal.App.2d 658, 662 (1958).

Although Petitioner argued that the transcript of the change of plea proceedings rebutted the presumption, the transcript showed only that during the transcribed proceedings there was never any express mention of whether the assault was committed with a deadly weapon or not. (LD 1, 204-16.) However, because the transcript does not specify which type of assault was involved, it does not contradict or undercut the official presumption. This is particularly so in light of the fact that the transcript itself reflects that there were additional documents concerning the plea, such as a plea form that contained information concerning the change of plea as well as waiver of rights. (Id. at 208-09.)

A rational trier of fact could have concluded that considering the unambiguous abstract of judgment in light of the

1  unrebutted presumption that official duty was regularly
2  performed, Petitioner had suffered a conviction of assault with a
3  deadly weapon in violation of Cal. Pen. Code § 245(a)(1).  Thus,
4  in deciding that sufficient evidence supported the finding that
5  Petitioner had suffered a prior conviction of a serious felony,
6  the state court did not render a decision that was contrary to,
7  or an unreasonable application of, clearly established federal
8  law.

9       Accordingly, even if Petitioner were entitled to the
10  protections of Jackson v. Virginia with respect to findings of
11  fact that resulted in sentence enhancements, Petitioner has not
12  shown that he is entitled to relief pursuant to 28 U.S.C.
13  § 2254(d)(1).

14      Finally, the Court notes that Petitioner has not established
15  an independent due process violation because he has not shown
16  that the alleged sentencing error was arbitrary or capricious.
17  See, Richmond v. Lewis, 506 U.S. 40, 50 (1992).  The state court
18  here proceeded to apply federal due process standards to the
19  evidence before it in light of generally applicable principles of
20  state law.  Petitioner has not demonstrated that the state
21  court's determination concerning the prior serious felony
22  conviction was arbitrary or capricious.

23      In summary, after reviewing the pertinent state court
24  decision, the Court concludes that insofar as Petitioner's claims
25  are based solely on state law, they should be dismissed.

26      With respect to Petitioner's federal claims, in accordance
27  with the foregoing analysis, the Court concludes that Petitioner
28  has not shown that the state court decision was contrary to, or

1   an unreasonable application of, clearly established federal law

2   within the meaning of 28 U.S.C. § 2254(d).  As to Petitioner's

3   federal claims, the petition for writ should be denied.

4        XI. Certificate of Appealability

5        Unless a circuit justice or judge issues a certificate of

6   appealability, an appeal may not be taken to the Court of Appeals

7   from the final order in a habeas proceeding in which the

8   detention complained of arises out of process issued by a state

9   court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537

10  U.S. 322, 336 (2003).  A certificate of appealability may issue

11  only if the applicant makes a substantial showing of the denial

12  of a constitutional right.  § 2253(c)(2).  Under this standard, a

13  petitioner must show that reasonable jurists could debate whether

14  the petition should have been resolved in a different manner or

15  that the issues presented were adequate to deserve encouragement

16  to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336

17  (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A

18  certificate should issue if the Petitioner shows that jurists of

19  reason would find it debatable whether the petition states a

20  valid claim of the denial of a constitutional right and that

21  jurists of reason would find it debatable whether the district

22  court was correct in any procedural ruling.  Slack v. McDaniel,

23  529 U.S. 473, 483-84 (2000).

24       In determining this issue, a court conducts an overview of

25  the claims in the habeas petition, generally assesses their

26  merits, and determines whether the resolution was debatable among

27  jurists of reason or wrong.  Id.  It is necessary for an

28  applicant to show more than an absence of frivolity or the

73

1 existence of mere good faith; however, it is not necessary for an

2 applicant to show that the appeal will succeed.  <u>Miller-El v.</u>

3 <u>Cockrell</u>, 537 U.S. at 338.

4     A district court must issue or deny a certificate of

5 appealability when it enters a final order adverse to the

6 applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

7     Here, it does not appear that reasonable jurists could

8 debate whether the petition should have been resolved in a

9 different manner.  Petitioner has not made a substantial showing

10 of the denial of a constitutional right.

11     Accordingly, it will be recommended that the Court decline

12 to issue a certificate of appealability.

13     XII.  <u>Recommendations</u>

14     Accordingly, it is RECOMMENDED that:

15     1) Insofar as Petitioner's claims rest solely on state law,

16 the claims be DISMISSED; and

17     2)  The petition for writ of habeas corpus otherwise be

18 DENIED; and

19     3)  The Clerk ENTER judgment for Respondent; and

20     4)  The Court DECLINE to issue a certificate of

21 appealability.

22     These findings and recommendations are submitted to the

23 United States District Court Judge assigned to the case, pursuant

24 to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

25 the Local Rules of Practice for the United States District Court,

26 Eastern District of California.  Within thirty (30) days after

27 being served with a copy, any party may file written objections

28 with the Court and serve a copy on all parties.  Such a document

74

1   should be captioned "Objections to Magistrate Judge's Findings
2   and Recommendations."   Replies to the objections shall be served
3   and filed within fourteen (14) days (plus three (3) days if
4   served by mail) after service of the objections.   The Court will
5   then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
6   § 636 (b)(1)(C).   The parties are advised that failure to file
7   objections within the specified time may waive the right to
8   appeal the District Court's order.   <u>Martinez v. Ylst</u>, 951 F.2d
9   1153 (9th Cir. 1991).

10        IT IS SO ORDERED.

11   **Dated:** __February 3, 2012__          ___**/s/ Barbara A. McAuliffe**___
12                                   UNITED STATES MAGISTRATE JUDGE

75